OPINION OF THE COURT
Kaye, J.
In response to the alarming spread of AIDS, the Commissioner of Education has promulgated regulations requiring all primary and secondary school students in the State to receive extensive instruction about the disease. Plaintiffs, by this action, challenge the regulations as violative of their First Amendment right to freely exercise their religious beliefs. The Appellate Division affirmed Supreme Court’s summary dismissal of the complaint. While plaintiffs ultimately must meet a high threshold of proof to sustain their contentions, on this factual record we conclude that summary rejection of their assertion of fundamental constitutional values was inappropriate, and we therefore modify the Appellate Division order and reinstate the amended complaint challenging defendants’ AIDS curriculum.
The individual plaintiffs are members of the Plymouth *117 Brethren, a religious organization of approximately 35,000 adherents worldwide, 2,000 of whom live in the United States. Plaintiff Foster Church, Inc., a New York religious corporation, owns the group’s real property and other tangible assets. In this State there are two Brethren communities — known as "local gatherings” or "fellowships” — one in Valley Stream (with 140 members, including the named plaintiffs) and one in Rochester (with 120 members).
As the Appellate Division noted, the Brethren are a devoutly religious group established in the 1820’s by Irish Christians who had become disenchanted with the established churches of the period (150 AD2d 14, 16). Their faith has consistently been dedicated to strict adherence to Biblical teachings. Fundamental to the Brethren creed is a precept of spiritual separatism by which members seek to distance themselves from all things they consider evil. Accordingly, the Brethren spend much of their time in group prayer, and they shun many modern technological innovations they consider evil.
Plaintiffs complain that they are now faced with evil in the form of the mandate that each school district promulgate an AIDS curriculum for its elementary and secondary school students. Specifically, the regulations require that elementary schools provide such instruction as part of the health education program for all pupils beginning in kindergarten (8 NYCRR 135.3 [b] [2]); secondary schools similarly must incorporate AIDS instruction into the required health instruction courses (8 NYCRR 135.3 [c] [2]).
Each curriculum must include instruction concerning the nature of the disease, methods of transmission and methods of prevention (8 NYCRR 135.3 [b] [2]). Recognizing the delicacy of some of the subject matter, the regulations further provide that: "No pupil shall be required to receive instruction concerning the methods of prevention of AIDS if the parent or legal guardian of such pupil has filed with the principal of the school which the pupil attends a written request that the pupil not participate in such instruction, with an assurance that the pupil will receive such instruction at home.” (8 NYCRR 135 [b] [2]; [c] [2].)
Plaintiffs are directly affected by the regulations requiring AIDS instruction in that approximately 35 Brethren children attend public schools in the Valley Stream High School District, where — beginning with the second semester of the 1988- *118 1989 school year — the secondary school curriculum includes 22 lessons concerning AIDS.
In November 1988, plaintiffs asked the school district to exempt their children from the entire AIDS curriculum. That request was denied on the ground that the regulations do not authorize a local board to grant a complete exemption. The board did, however, exempt Brethren children from the segment of the curriculum labeled "Prevention,” consisting of five lessons in how abstinence from illegal intravenous drug use and sexual activity can prevent the transmission of AIDS. Lessons the children must attend include "Practice skills in saying no,” "Know ways the AIDS virus can and cannot be transmitted,” and "Recognize and evaluate media messages regarding sexuality.” As the school superintendent wrote plaintiffs, "We are still prepared to assist you in reasonable ways to develop your appeal [to the Commissioner of Education] for exemption from this instruction as we are not in disagreement with your position, but rather are bound by State Education Department directives.”
In February 1989, plaintiffs simultaneously filed this lawsuit and a petition to the Commissioner on behalf of all children living in the Valley Stream and Rochester fellowships. The lawsuit was instituted against the Valley Stream High School District, the Commissioner and the State for a declaration that the regulations compelling AIDS-related health instruction violated both plaintiffs’ constitutional rights to freely exercise their religion and their privacy right to rear their children. Plaintiffs’ administrative application to the Commissioner — made pursuant to section 16.2 of the Rules of the Board of Regents (8 NYCRR 16.2)[1] and Education Law § 3204 (5)[2] — sought* a religious exemption from all aspects of the AIDS curriculum.
Brethren children have already been exempted by the *119 school district from the portion of the health and hygiene curriculum relating to human sexuality.
In both their complaint and their administrative petition, plaintiffs asserted that the AIDS curriculum conflicts with their strictly held religious belief that followers not engage in sexual relations outside of marriage and not be exposed to instruction concerning sexuality or morality other than that which is imparted by the community. Plaintiffs further urged that an order exempting their children from AIDS instruction would not present a danger to the public, in light of the improbability of their children’s participation in activities that transmit AIDS.
On March 3, 1989, Supreme Court granted the Commissioner’s request for a stay pending the determination of the administrative petition. Shortly thereafter the Commissioner denied plaintiffs’ application without passing on their constitutional claim, observing that his office was "not the appropriate forum for litigating novel questions of constitutional law.”
While not questioning the sincerity of plaintiffs’ religious convictions, the Commissioner denied the request on the ground that their claims were outweighed by the State’s interest in educating all students about AIDS. "At this point in the history of the disease,” the Commissioner wrote, "it is well recognized that education is the most powerful and important weapon against the spread of AIDS. * * * Clearly, immediate and universal public education must play a primary role in curbing a disease which already has had such catastrophic effects.” The Commissioner further noted that some members of the Brethren may fall short of community expectations, and children may leave in pursuit of alternative life-styles — concluding that plaintiffs’ argument was "not compelling.” Finally, the Commissioner admonished the local board for its failure to implement the exemption it had allowed the Brethren from instruction in AIDS prevention. Brethren children, like all other students in the physical education classes, had been given pamphlets entitled "The Wellness Way: Understanding and Preventing AIDS,” which contained advice to "use latex condoms plus spermicide” "if you can’t be sure your partner is not infected with the virus,” and to "limit the number of sexual partners to reduce your chance of exposure to the virus.”
Following the Commissioner’s decision plaintiffs moved in Supreme Court for summary judgment. In support of this *120 motion plaintiffs relied upon their verified amended complaint, a recent study of the Brethren by an English academic, and two joint affirmations of plaintiffs, one of which contained an essay — "We Have a Life of our Own” — outlining the religious and ethical principles the Brethren follow, and the manner in which members guide the lives of their children in accordance with the tenets of their faith. Based on these submissions, plaintiffs’ relevant factual allegations may be summarized as follows.
First, the Plymouth Brethren are an identifiable religious group with a long history of maintaining a cohesive community separated and insulated from society. Members — who have been accorded "conscientious objector” status by the Selective Service System — are strongly moral and principled individuals practicing and reinforcing personal purity and other exemplary moral behavior. Apart from the practical necessity for this very small group to attend public school and earn a livelihood in the community, members’ associations are limited to other Brethren.
Second, plaintiffs’ children are not permitted to socialize with nonmember children after school, or even to eat with them at school. The Brethren do not allow television or radio, and they do not see movies or read magazines. Their lives are spent in worship, or in social activities limited to association with other members under the constant moral guidance and supervision of parents and other community adults in an "extended family.”
Third, insistence upon rigorous morality is interwoven with the movement’s strong sense of separateness. The central principle of the Brethren’s religion is the obligation to "separate from evil.” Even to know the details of evil is regarded as subversive. This injunction forms the basis of their teaching and practice.
Fourth, in that the Brethren condemn all sexual relations outside of marriage as evil and the details of that evil as subversive, "[t]he religious tenets of its members flatly * * * forbid exposure to instruction concerning sexual relations and moral teachings other than those imparted by members of the community to members of the community.” Consequently, plaintiffs believe that their children’s exposure to the contents of the AIDS curriculum is inimical to their religious, moral, ethical and personal well-being. In plaintiffs’ own words: "to expose our children to the detail of evil amplified in the entire *121 sex, drug and AIDS curriculum would undermine the foundations of our faith and scar the moral values which have been instilled into our children from their very earliest days and could even jeopardize their place in the holy fellowship of God’s Son, our Lord Jesus Christ, if they were diverted from a path of righteousness.”
Fifth, exposure to the AIDS curriculum would undermine the Brethren’s ability to guide their children’s moral lives in accordance with their faith. In short, as plaintiffs affirmed, such exposure "carries with it the very real threat of undermining [plaintiff’s] religious community and religious practice.”
Sixth, by reason of the extent to which the Brethren involve themselves in instilling exemplary behavior in their children —including the teaching of the moral and health dangers of AIDS, the abstinence from all sexual relations outside of marriage, and the avoidance of illegal drugs in order to remain physically and spiritually "pure” — no public health risk will result from the exemption. Whatever the failings of society at large in educating children to avoid the dangerous and unhealthy practices by which AIDS is transmitted, in Brethren society such instruction is successful.
Finally, Brethren "children have been exposed to school disciplinary sanction by reason of their justified refusal to participate in mandatory AIDS-related instruction.”
Defendants separately cross-moved for summary judgment, arguing that plaintiffs’ free exercise rights would not be violated by merely exposing their children to the information contained in the AIDS curriculum; they urged, moreover, that the State has a compelling interest in educating its citizens to protect them from the dangers of AIDS. Defendants particularly disputed plaintiffs’ allegation that they are part of an isolated community, pointing to the degree to which they are "mixed-in” and "integrated” with the general community. Defendants alleged that the need to educate plaintiffs’ children about AIDS is further underscored by the possibility— however remote — that disaffected members may leave or be expelled from the confines of the faith.
Supreme Court granted defendants’ motions for summary judgment. The court found that plaintiffs were integrated into the local community and not outside the zone of persons in need of protection from a known hazard, that the mandated instruction was not contrary to plaintiffs’ religious beliefs or *122 destructive of the community as a whole, and that in any event compelling State interests justify the requirement. The court further upheld the Commissioner’s determination on the ground that it had a rational basis. The Appellate Division affirmed, but on a somewhat different rationale. While acknowledging that the compulsory exposure of plaintiffs’ children to the details of evil which their religion instructs them to avoid may burden plaintiffs’ religious rights, the court nevertheless concluded that the State’s compelling interest in AIDS education justified that burden.
On plaintiffs’ appeal, we now modify the Appellate Division order by reversing the award of summary judgment against them.
I.
As both this court and the United States Supreme Court have long recognized, public education is committed to the control of State and local school authorities. The Commissioner of Education and local officials are vested with wide discretion in the management of school affairs (see, Matter of Board of Educ. v Ambach, 70 NY2d 501, 510-511; Bullock v Cooley, 225 NY 566, 576-577; Board of Educ. v Pico, 457 US 853, 863-864). Time and again the courts have made clear that the judiciary should not lightly intrude in the resolution of school conflicts, which usually are best left to the education authorities (see, Board of Educ. v Nyquist, 57 NY2d 27, 38-39, appeal dismissed 459 US 1138; Epperson v Arkansas, 393 US 97, 104). Deference to the education_ decisions of State and local officials — particularly in matters of curriculum — embodies several important concerns, including preservation of local democratic control over educational policy; protection of teachers’ academic freedom; maintenance of policies that comport with the views of educational experts; and formulation of curriculum so as to transmit community values and foster the free exchange of ideas (see, Keyishian v Board of Regents, 385 US 589, 603; Strossen, ",Secular Humanism” and "Scientific Creationism”: Proposed Standards for Reviewing Curricular Decisions Affecting Students’ Religious Freedom, 47 Ohio St LJ 333, 354-355 [1986]).
Ordinarily, judicial intervention is appropriate only when school conflicts "directly and sharply implicate basic constitutional values.” (Epperson v Arkansas, supra, at 104.) The discretion of the school authorities, however broad, plainly *123 must be "exercised in a manner that comports with the transcendent imperatives of the First Amendment.” (Board of Educ. v Pico, supra, at 864.)
Precisely that distinction was recognized in the decision and order by which the Commissioner rejected plaintiffs’ application for a total exemption from the AIDS curriculum. Were the test merely one of rational basis, unquestionably the Commissioner’s determination, evidencing care and sensitivity to plaintiffs’ predicament, would be sustained. Indeed, there would be much to be said for upholding the determination on the Commissioner’s stated ground that a total exemption from a portion of the school curriculum "sends the message that a pupil’s participation in AIDS education is negotiable.”
But as the Commissioner himself noted, plaintiffs’ contention was that denial of a total exemption burdens their constitutional right of free exercise, and an administrative appeal is not the appropriate forum for resolving "novel questions of constitutional law.” The cases make clear that a detailed factual showing is necessary in order to sustain a contention that challenged instruction burdens sincerely held religious beliefs; such issues are plainly inappropriate for administrative resolution. Moreover, given the findings of fact and conclusions of law necessary for any such plaintiff to prevail — these plaintiffs may well be among the few that could even survive summary judgment — there need be no fear that the AIDS curriculum, or any other part of defendants’ curriculum, would be widely regarded as "negotiable.”
The novel question of constitutional law reserved by the Commissioner now becomes the focus of this appeal.
II.
Reflecting the rich religious pluralism that characterizes and distinguishes this Nation, the First Amendment to the Federal Constitution enjoins the State from enacting any laws "prohibiting the free exercise” of religion.[3] Under this clause a claimant may seek a religious exemption from a government requirement linked to a benefit program such as public education (Wisconsin v Yoder, 406 US 205; see generally, Dent, Religious Children, Secular Schools, 61 S Cal L Rev 863 [1988]; Note, Religious Exemptions Under the Free Exercise *124 Clause: A Model of Competing Authorities, 90 Yale LJ 350 [1980]).
In deciding whether a claimant is entitled to such an exemption, the Supreme Court has formulated a two-step analysis, both steps obviously fact-sensitive (see generally, Mozert v Hawkins County Pub. Schools, 765 F2d 75 [6th Cir] [remanding colorable free exercise claim for further factual development], on remand 647 F Supp 1194 [ED Tenn], revd 827 F2d 1058, cert denied 484 US 1066; Pillar of Fire v Denver Urban Renewal Auth., 181 Colo 411, 509 P2d 1250 [remanding colorable free exercise claim], appeal after remand, sub nom. Denver Urban Renewal Auth. v Pillar of Fire, 191 Colo 238, 552 P2d 23). First, a claimant must show a sincerely held religious belief that is burdened by a State requirement (see, Hernandez v Commissioner of Internal Revenue, 490 US —, —, 109 S Ct 2136, 2148; Lyng v Northwest Indian Cemetery Protective Assn., 485 US 439; see generally, Lupu, Where Rights Begin: The Problem of Burdens on the Free Exercise of Religion, 102 Harv L Rev 933 [1989]). Second, the State must demonstrate that the requirement nonetheless serves a compelling governmental purpose, and that an exemption would substantially impede fulfillment of that goal (Hobbie v Unemployment Appeals Commn. of Fla., 480 US 136, 141).
With respect to both prongs of the test, this case presents material issues of fact that preclude summary judgment.
Burden on Free Exercise
While the Supreme Court has been less than clear in defining just how much a State requirement need burden religion in order to violate the Free Exercise Clause, plainly governmental action that merely offends religious beliefs does not implicate First Amendment values (see, Joseph Burstyn, Inc. v Wilson, 343 US 495, 505). This is particularly so in the context of school curriculum decisions, where important policy concerns dictate deference to education authorities.
It is generally acknowledged that mere exposure to ideas that contradict religious beliefs does not impermissibly burden the free exercise of religion.[4] The First Amendment does not *125 stand as a guarantee that a school curriculum will offend no religious group.[5] Moreover, parents have no constitutional right to tailor public school programs to individual preferences, including religious preferences (see, Epperson v Arkansas, 393 US 97, 106, supra).
Plaintiffs accept that the Constitution offers no protection against exposure to ideas that offend their religion. They maintain, however, that the Supreme Court recognized an exception to the "mere exposure” rule in Wisconsin v Yoder (406 US 205, supra), and that they fall squarely within that exception.
Yoder involved members of two Amish groups who refused, on the basis of religious belief, to send their children to school beyond the eighth grade. The parents were convicted of violating Wisconsin’s compulsory school-attendance law, which required parents to send their children until age 16. At trial the Amish asserted that the law required what their religion forbade and thus violated the Free Exercise Clause. In addition, the Amish adduced testimony from expert witnesses, scholars on religion and education, who explained the relationship between the Amish belief concerning school attendance and the more general tenets of their religion, and described the devastating impact that compulsory high school attendance could have on the continued survival of the religious community.
The Supreme Court in Yoder held Wisconsin could not require the Amish to send their children to public school after the eighth grade. In finding an impermissible burden on free *126 exercise, the Supreme Court examined Amish life and culture in some detail, ultimately concluding that what was in issue were long-standing beliefs shared by an organized group, that the beliefs related to religious principles and pervaded and regulated Amish daily life, and that the State law threatened the continuing existence of the Old Order Amish church community.
The reach of Yoder is plainly limited. The Supreme Court itself made that clear in cautioning that its holding would apply to "probably few other religious groups or sects” and that "courts must move with great circumspection in performing the sensitive and delicate task of weighing a State’s legitimate social concern when faced with religious claims for exemption from generally applicable educational requirements.” (406 US, at 235-236.) Commentators have speculated that "[f]ew future free exercise claimants are likely to match the testimony of extreme injury relied upon by the Supreme Court in Yoder. ” (Pepper, Reynolds, Yoder, and Beyond: Alternatives for the Free Exercise Clause, 1981 Utah L Rev 309, 338 [1981]; Smith, Constitutional Rights of Students, Their Families, and Teachers in the Public Schools, 10 Campbell L Rev 353, 376-379 [1988]; Strossen, op. cit., at 387-389, 390, n 288.)
Nevertheless, the present case bears some striking similarities to Yoder. As in Yoder, plaintiffs seek a religious exemption from exposure to ideas that are not merely offensive but allegedly abhorrent to their central religious beliefs. And like Yoder, governmental action purportedly compels them to participate in instruction that is at odds with a fundamental tenet of their religious belief — remaining simple from evil (406 US, at 218). The Brethren assert, like the Amish in Yoder, that these are entrenched religious beliefs, not the product of "a way of life and mode of education by a group claiming to have recently discovered some 'progressive’ or more enlightened process for rearing children for modern life.” (Id., at 235.) Their adherence to "the Principle of Separation,” they say, also stems from "a sustained faith pervading and regulating [their] entire mode of life.” (Id., at 219.)
Thus, on this record we cannot agree with the sweeping conclusions reached by the Trial Judge in granting summary judgment that the mandated AIDS curriculum is neither contrary to the Brethren’s religious beliefs nor destructive of the community as a whole. Rather, the record better supports the conclusion reached by the Appellate Division that "com *127 pulsory education which exposes [plaintiffs’] children to the 'details of evil’ which their religion instructs them to avoid may place a limited burden upon the free exercise of their religion.” (150 AD2d, at 19.)
But it is as much plaintiffs’ alleged differences from the Amish in Yoder as their similarities that give pause and persuade us that further factual development is required before a conclusion can be reached — either way — on the question whether the free exercise of sincerely held religious beliefs is burdened by compulsory AIDS education, how great such a burden might be, and what if any further accommodation should be made. With such significant public and private interests in the balance, on this record it is at the least prudent to withhold judgment until there is a firmer basis for the necessary findings of fact than the brief, contentious, often conclusory affidavits both sides have submitted. The trial record in Yoder is replete with fact, scholarly and expert testimony that has no parallel in the present record.
Our decision to deny summary relief in this case, however, is not based simply on prudence. Our decision rests on the traditional ground that summary judgment should be denied where there are disputed issues of material fact, as there are in this record. Two examples of such issues are pertinent to the question of burden.
Defendants acknowledge the sincerity of plaintiffs’ religious beliefs. There is no dispute as to the tenets of their faith, and no need for the court to go behind the declared content of their religious beliefs. But defendants do very much question the extent to which plaintiffs have become part of mainstream society. They point to the not insubstantial facts that plaintiffs live and work in the Valley Stream community, their children attend public schools, and they take in new followers from the public — urging that plaintiffs are therefore not at all the isolated religious community that was the subject of Yoder. Plaintiffs, by contrast, insist that they are exactly like the Amish in Yoder, except for what they characterize as the "minimal requirements” that they attend public school and work in the community, because it is not feasible for them to do otherwise. This factual dispute goes to the heart of plaintiffs’ assertions that their religious exercise would be burdened by exposure to the AIDS curriculum. If plaintiffs in their daily lives are so thoroughly integrated into the larger society — and its evils — the State requirement may in fact impose no bur *128 den, or only the "limited burden” the Appellate Division found. This clash of contentions — which divided the two lower courts — cannot be properly determined on the present record.
Somewhat relatedly, a central disputed issue exists as to whether the AIDS curriculum poses any threat to the continued existence of the Brethren as a church community. That conclusion was factually established by trial testimony and findings in Yoder (see, 406 US, at 209-212, 218-219, 235-236); and whether or not the law actually requires such extreme injury, plaintiffs themselves by their affirmed statements have represented that they are so threatened. But defendants have steadfastly maintained that no irreversible prejudice would befall plaintiffs and that, to the contrary, the proposed instruction would only benefit their children. Again, as this case has been posited by plaintiffs themselves, the record is inadequate to choose as a matter of law between the parties’ disputed assertions.
Compelling State Interest
Even religious rights must bow to the compelling interests of the State, pursued by the least restrictive means (Thomas v Review Bd., 450 US 707, 718; Sherbert v Verner, 374 US 398, 406-409; Wisconsin v Yoder, 406 US, at 215, 221, 224, 236).
If plaintiffs succeed in establishing that exposure to the AIDS curriculum substantially burdens their religious practice, defendants’ refusal to grant the exemption will be then subject to "strict scrutiny.” (Hobbie v Unemployment Appeals Commn. of Fla., 480 US 136, 141, supra.) Both the trial court and the Appellate Division were satisfied that the State’s interests in AIDS education on its face was so compelling that it necessarily would override plaintiffs’ free exercise rights. While that conclusion may ultimately prove correct, it was error to reach it on the present record.
As a blanket proposition, the State has a compelling interest in controlling AIDS, which presents a public health concern of the highest order. Nor can there be any doubt as to the blanket proposition that the State has a compelling interest in educating its youth about AIDS. Education regarding the means by which AIDS is communicated is a powerful weapon against the spread of the disease and clearly an essential component of our nationwide struggle to combat it.
But the Education Law and regulations themselves provide for exemptions from the prescribed curriculum. Moreover, *129 history teaches that constitutional protections do not readily yield to blanket assertions of exigency. As with other grave risks we have faced during the past two centuries, the threat of AIDS cannot summarily obliterate this Nation’s fundamental values (see, Orland and Wise, The AIDS Epidemic: A Constitutional Conundrum, 14 Hofstra L Rev 137, 150 [discussing Korematsu v United States, 323 US 214]). That compelling public interests underlie the mandate for AIDS education thus does not, in and of itself, end all inquiry as to whether 35 Brethren children must be denied an exemption.
Where burden is established, the State must show with "particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to [these children].” (Wisconsin v Yoder, 406 US, at 236; see also, Sherbert v Verner, 374 US, at 408-409; Quaring v Peterson, 728 F2d 1121 [8th Cir], affd sub nom. Jensen v Quaring, 472 US 478; Larson v Valente, 456 US 228, 248.) On the present record, the State has not made the showing required to support summary judgment in its favor.
As is evident from the submissions, the compelling health interest in educating school children about AIDS is controlling the spread of the disease. Defendants advance several arguments to the effect that this interest would be substantially impeded by granting plaintiffs a total exemption from the AIDS curriculum. That conclusion is not, however, self-evident, as indicated by the following two disputed fact issues.
In supporting the compelling need to educate Brethren children about AIDS, defendants point both to plaintiffs’ extensive life within the community and to the possibility that some of them may go astray, or leave the fellowship, or be cast out, thus consigned to living among the general population ignorant of AIDS. Plaintiffs rejoin that their lives are indeed separate, and that the State’s allegations regarding defections are pure speculation; there is no evidence either way as to defections among the New York State Brethren. Even assuming that a defection could be said to pose a public health threat, plaintiffs strenuously dispute that the education they provide their children leaves them ill equipped to cope with the dangers of AIDS. These contentions cannot be determined by the existing record.
Again somewhat relatedly, given the particular means by which AIDS is transmitted a real question is raised about the education Brethren children do receive, and whether the State *130 can achieve its goal of AIDS control by means that would not unduly burden plaintiffs’ religious practice. If plaintiffs showed that the education they offered their children was the functional equivalent of the AIDS curriculum — giving due regard to the physical as well as moral concerns — the State might well be required to accommodate their beliefs (see, Callahan v Woods, 736 F2d 1269, 1274-1275 [9th Cir] [remanding for further factual development on whether grant of constitutionally based exemption would impede the objective sought to be advanced by the State]; Wisconsin v Yoder, supra; Buchanan, Accommodation of Religion in the Public Schools: A Plea for Careful Balancing of Competing Constitutional Values, 28 UCLA L Rev 1000 [1981]).
On this point the parties are at loggerheads. Defendants allege that Brethren parents do not offer a suitable alternative form of education, in that they provide their children only with moral instruction which is not an adequate substitute for clinical information. The Appellate Division characterized Brethren teaching as "uncontradicted religious indoctrination which denies the existence of undeniable health crises”. (150 AD2d, at 21.) But plaintiffs strenuously contest those assertions. Although Brethren children are provided with moral instruction regarding sex and drug use, plaintiffs have never stated that this is all they teach their children and they represent that, if granted an exemption, they would "instruct [their] children at home or in their assembly concerning the AIDS virus and epidemic.” They further submit that, as a practical matter, by teaching their children to avoid all sexual activity outside of marriage and to avoid all illegal drugs in order to remain physically and spiritually "pure,” they have developed "a strong AIDS-prevention program” that has been singularly successful in preventing its members from either contracting the disease themselves or transmitting it to others. This factual dispute also requires a fuller record.
In short, while the spread of AIDS heightens and intensifies the public interest in education, it does not overrun other cherished values that may not require sacrifice.[6] To be sure, plaintiffs must meet a high threshold of proof, but at this *131 juncture we cannot summarily brush aside the passionate assertions of a longstanding, highly individual — if not unique —religious group in this State that exposure to defendants’ AIDS curriculum could alone destroy the foundations of their faith and "jeopardize their place in the holy fellowship of God’s Son”.
Accordingly, the order of the Appellate Division should be modified by denying defendants’ motions for summary judgment, with costs, and otherwise affirmed.

. Section 16.2 of the Rules of the Board of Regents provides: "A petition, duly verified, may be filed with the commissioner by a proper person authorized to represent a religious group on a statewide basis asking that the children of parents or guardians professing the religion of such group be excused from such part of the study in health and hygiene as may be in conflict with the tenets of the religion of such group.”

. Education Law § 3204 (5) provides: "Subject to rules and regulations of the board of regents, a pupil may, consistent with the requirements of public education and public health, be excused from such study of health and hygiene as conflicts with the religion of his parents or guardian. Such conflict must be certified by a proper representative of their religion as defined by section two of the religious corporations law.”

. Plaintiffs have asserted no claim under the Free Exercise Clause of the State Constitution (NY Const, art I, § 3).

. Judge Titone’s dissent erroneously likens this case, and the long-established line of "mere exposure” cases, to the very different cases concerning governmental requirement of affirmative conduct that is offensive to one’s religious beliefs (see, Mozert v Hawkins County Bd. of Educ., *125 827 F2d 1058 [elaborating on the distinction]). Compelling Jewish or Muslim school children to violate their dietary laws by eating pork, or requiring prisoners to submit to acts that would impinge on sincerely held religious beliefs (dissenting opn of Titone, J., at 135-136), would be illustrations of the more intrusive "affirmative conduct” cases (see also, Torcaso v Watkins, 367 US 488 [invalidating an oath of belief in God required of a notary public]; Board of Educ. v Barnette, 319 US 624 [compulsory secular flag salute violates First Amendment]).

. See, e.g., Grove v Mead School Dist. No. 354, 753 F2d 1528, 1543 (9th Cir) (Canby, J., concurring) (stating that mere offense at having textbook in school curriculum does not support Free Exercise Clause), cert denied 474 US 826; Wilson v Block, 708 F2d 735, 741 (DC Cir) (finding that government actions that merely offend or cast doubt on religious beliefs do not violate Free Exercise Clause), cert denied 464 US 956; Williams v Board of Educ., 388 F Supp 93, 96 (SD W Va) (declaring that First Amendment does not preclude schools from teaching material offensive to religions), affd 530 F2d 972 (4th Cir); Davis v Page, 385 F Supp 395, 404 (D NH) (holding that First Amendment offers no protection from health course found to be distasteful).

. Judge Titone’s concluding discussion in his dissenting opinion is both misdirected and undeservedly critical of the court (see, dissenting opn of Titone, J., at 137-138). By reversing Supreme Court and the Appellate Division and giving the Brethren an opportunity to prove their allegations, we pronounce no "right” or "wrong.” It will now be for the trial court, applying the law to a proper factual record, to determine which party should prevail.