Simons, J.
(concurring). The court is unanimous that individuals enjoy a common-law right to determine what may be done to their bodies but that right may be qualified by some overriding State interest. The majority hold, however, that unless the State has acted to limit the right, presumably by statute, the individual’s claim must prevail over any apparent State interest.[1] I agree with Judge Hancock that the right is *232 not that broad and is limited by the State’s general interest in preserving life, protecting innocent third parties, preventing suicide and promoting medical ethics (see, Matter of Storar, 52 NY2d 363, 377-378, n 6; see also, Byrn, Compulsory Life Saving Treatment for the Competent Adult, 44 Fordham L Rev 1, 16-36; Smith, All’s Well That Ends Well: Toward a Policy of Assisted Rational Suicide or Merely Enlightened Self-Determination?, 22 UC Davis L Rev 275). As so interpreted, a court could conclude that Mrs. Nicoleau’s common-law right does not outweigh the State’s interest in preserving life and protecting her child, from neglect. I would grant defendants relief, however, because the State cannot require Mrs. Nicoleau to undergo medical treatment contrary to her religious beliefs if the administration of it is not justified by some compelling reason not apparent on this record. Accordingly, I concur in the court’s determination affirming the order of the Appellate Division.
As we have said before, individuals possess a considerable degree of leeway in refusing measures to cure their illnesses or save their lives. We have not previously defined the scope of their right to do so because our prior cases have generally concerned the sufficiency of the evidence of a gravely ill incompetent patient’s wishes to discontinue or avoid treatment. None were decided solely by balancing the common-law right against opposing State interests (see, Matter of Storar, supra; Matter of Westchester County Med. Center [O’Connor], 72 NY2d 517; see also, cases cited in concurring opn of Hancock, Jr., J., herein, at 237, for cases from other jurisdictions).
The majority now define the right of self-determination broadly, holding that unless the State has expressed its interest in overriding the individual’s right in specific circumstances, no State interest exists. That reasoning ignores a multitude of statutes and judicial decisions evidencing the State’s commitment to the sanctity of life and it imposes a burden of specificity on the Legislature which, for all practical purposes, leaves the right absolute. The majority’s rule, examined without considering defendants’ free exercise claim which is not a factor in their analysis, allows Mrs. Nicoleau an unqualified right to reject medical treatment.
Most courts, before approving a patient’s decision to forego life-sustaining treatment, would consider the nature of the patient’s condition, the prescribed treatment and the probabil *233 ity of its success. They would strike the balance between the patient’s right and the State interest by considering whether (1) the patient’s condition is terminal, has lessened life expectancy or has drastically reduced the quality of life (see, e.g., Matter of Eichner v Dillon, 52 NY2d 363 [persistent vegetative state]; Bouvia v Superior Ct., 179 Cal App 3d 1127, 225 Cal Rptr 297 [removal of feeding tube from 28-year-old quadriplegic]); (2) the treatment is painful or will result in permanent injury or disfigurement (see, e.g., Lane v Candura, 6 Mass App 377, 376 NE2d 1232 [amputation of leg]; In re Yetter, 62 Pa D & C 2d 619 [removal of breast]); and (3) the treatment offers a reasonable prospect of success, i.e., it will cure or improve the patient’s condition rather than merely prolong life. Some courts would also consider significant the patient’s desire to live and the effect the election to avoid or discontinue treatment would have on others (see, Matter of Conroy, 98 NJ 321, 486 A2d 1209,1224; Superintendent of Belchertown State School v Saikewicz, 373 Mass 728, 743, n 11, 370 NE2d 417, 426, n 11).
Contrasting these factors with the circumstances in the present case, Mrs. Nicoleau is neither aged nor grievously infirm. The risk of death from treatment is modest and blood transfusion, a proven, uncomplicated means of treatment, is available to sustain her life, as a practical certainty, without adverse residual effects. A patient’s right to decline or withdraw medical treatment under such circumstances should be far narrower and the State’s interest in preserving her life far greater. The majority, however, believe these considerations are insufficient. They hold that a young, healthy mother of a minor child, suffering from a transient, but life-threatening, condition whose life can be almost certainly saved by the routine and painless act of transfusing blood can reject the administration of this treatment without reason. I cannot agree that the State has no cognizable interest under such circumstances. Indeed, it can reasonably be argued that if competent adults, who are presumed to know the natural and probable consequences of their acts, may reject lifesaving treatment without reason the rule condones a method of suicide. Thus, if that was all there was to the case a Judge might well conclude that the State interest in preserving life and protecting the interests of minor children was sufficient to override the patient’s wishes.
That is not all there is to it, however. Mrs. Nicoleau is a Jehovah’s Witness. She believes in the tenet of that faith which holds that it is sinful to receive blood from outside one’s *234 own body and the sincerity of her belief is not questioned. She has no less commitment to life than others but transfusion is unacceptable to her as a matter of conscience. Her religious conviction changes treatment that is routine for others into extraordinary therapy which she cannot accept. Because of this, she claims the State violated her Federal and State constitutional right to the free exercise of her religion when it authorized the transfusion of blood against her wishes (US Const 1st Amend; NY Const, art I, § 3).[2]
When this factor is considered, defendants’ right to relief is manifest. Although her right of self-determination, standing alone, may be restricted if it is outweighed in any degree by cognizable State interests, when the State requires her to undergo treatment which violates her religious beliefs it interferes with her fundamental constitutional rights. Before doing so, it must demonstrate under the "strict scrutiny” test that the treatment pursues an unusually important or compelling goal and that permitting her to avoid the treatment will hinder the fulfillment of that goal (see, Hobbie v Unemployment Appeals Commn. of Fla., 480 US 136, 141; Ware v Valley Stream High School Dist., 75 NY2d 114, 128; People v Woody, 61 Cal 2d 716, 394 P2d 813 [involving an exemption from the criminal drug laws on religious grounds]; see generally, Tribe, American Constitutional Law §§ 14-12, 14-13 [2d ed], and authorities cited therein). The record contains no evidence to support a finding of such compelling State interest (cf., Prince v Massachusetts, 321 US 158; Jacobson v Massachusetts, 197 US 11). Accordingly, I would hold that Supreme Court should *235 not have permitted administration of blood to Mrs. Nicoleau against her wishes.

. The majority’s suggestion (majority opn, at 231, n 3) that a court might in some unforeseeable situation in the future override an individual’s right of self-determination adds little to qualify the rule. If the court was not justified in recognizing the serious State interests implicated in this case and weighing them against the patient’s right, it is difficult to envision any situation in which it could do so absent a specific controlling statute. The majority’s rule appears to be absolute for all practical purposes (see, concurring opn, Hancock, Jr., J., at 235, n 1).

. The First Amendment to the Constitution provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof’. The amendment is applicable to the State’s by incorporation into the Fourteenth Amendment (see, Cantwell v Connecticut, 310 US 296).
The New York Constitution, article I, § 3 provides:
"[Freedom of worship; religious liberty]
"The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.”