OPINION OF THE COURT
Peter P. Cusick, J.
This is a petition in the nature of a CPLR article 78 proceeding, challenging the respondent’s program to distribute condoms to students in the public high schools, on statutory or constitutional grounds. Petitioners also seek declaratory and injunctive relief.
The petitioners, Alfonso and Gough, are parents of unemancipated minors who are students at local public high schools. Petitioner Petrides is a member of the Board of Education of the City of New York, one of the named respondents herein. The other named respondent, Fernandez, is the schools’ Chancellor appointed by the Board.
The relevant facts, culled from the papers, documents, and arguments of counsel, can be stated briefly:
Respondents have approved and implemented a plan, as part of an AIDS education program, to make condoms available to public high school students, for the stated purpose of stopping the spread of the HIV virus and the AIDS epidemic. The condom availability program is not mandatory; that is, students are not required to participate in the distribution of the condoms, but if they so choose, condoms are available in health resource rooms, located within the school building, upon request. Teachers and staff personnel with some health-related instructional training are available for counseling. Students are not required to obtain parental consent or identify themselves in order to receive a condom. No student is required to request or obtain a condom and there is no penalty of any kind if a student chooses not to participate in the program.
Although parents have a right to request that their children not participate in that part of the required classroom instruction concerning the methods of prevention of AIDS (8 NYCRR 135.3 [c] [2]), there is no provision for an opt-out with respect to the voluntary condom availability program.
*901 The petitioners’ arguments are twofold: First, they contend that the program violates Public Health Law § 2504. Secondly, they argue that the program violates their due process rights and is violative of the "free exercise” rights under the First Amendment.
1. Is the condom availability program a "health service”, and prohibited by Public Health Law § 2504 without parental consentí
Petitioners argue that Public Health Law § 2504 provides a bright-line rule regarding the necessity of parental consent for health services and that the condom availability program is such a service and therefore falls within section 2504. The respondents contend, however, that such an interpretation overbroadens the application intended by the Legislature. Although section 2504 does not specifically define "health service”, 8 NYCRR 136.1 (d) defines health service as including an annual medical examination, dental inspection or screening, vision screening, and audiometer tests. The condom availability program clearly does not fall within one of these categories.
Case law also offers little guidance in defining health services, focusing instead on issues concerning the right to consent, control or refuse medical treatment in the specific context of a physician/patient relationship. Specifically, petitioner cites Matter of Thomas B. (152 Misc 2d 96 [1991]) which focused on the issue of the need for parental consent for medical treatment under section 2504. The facts in Thomas B. were that the mother of a 15 year old petitioned the court for an order requiring her child to undergo diagnostic surgery for a tumor. The court held that "[a]n implicit corollary of [section 2504 (1)] is that a person under 18 years of age may not give effective consent for such services.” (Supra, at 98.) Notably the facts of this case differ from the facts at hand in that the issue in Thomas B. specifically concerned medical treatment administered by a licensed physician which fits within the explicit as well as intended meaning of New York Public Health Law § 2504.
A similar phrase, "health care services” has been held to include care given by medical practitioners and hospitals in the context of medical malpractice (Musso v Westfield Mem. Hosp., 64 AD2d 851).
*902 Other cited cases have also addressed the issue of the need for parental consent, but the treatment or conduct involved was clearly a medical service. (See, Matter of Long Is. Jewish Med. Center, 147 Misc 2d 724 [1990] [court ordered necessary medical treatment including blood transfusion for patient weeks away from his 18th birthday, after patient and parents refused blood transfusion based on religious beliefs]; Burton v Brooklyn Doctors Hosp., 88 AD2d 217 [prolonged liberal administration of oxygen to premature baby without obtaining parents’ informed consent].)
It is not without significance that condoms are not regulated in the same manner as prescription drugs; they need not be dispensed by a licensed pharmacist and are available for sale even in delicatessens. Furthermore, the sale of condoms to minors may not be prohibited by law. (Carey v Population Servs. Intl., 431 US 678.)
Although the condom availability program is clearly health related, the court concludes that it does not qualify as a "health service” under Public Health Law § 2504 and is not prohibited by that statute without parental consent.
2. Does the condom availability program violate petitioners’ free exercise of their religion under the First Amendment?
A viable First Amendment claim is not triggered by a voluntary school program which is neutral on its face and supported by a compelling State interest. A crucial aspect of the school program is that it is entirely voluntary and imposes no mandatory requirements on students to participate. The voluntary aspect of this program clearly sets this case apart from Wisconsin v Yoder (406 US 205 [1972]), as well as Ware v Valley Stream High School Dist. (75 NY2d 114 [1989]), cited by petitioners in support of their case. Yoder involved two Amish groups who claimed that the enforcement of Wisconsin’s compulsory education law would gravely endanger and possibly destroy their ability to freely exercise their religious beliefs. The Supreme Court held that the respondents were not required to comply with the law since it threatened the continued existence of the Amish religion. The court noted that its holding would apply to "probably few other religious groups or sects”. (Wisconsin v Yoder, supra, at 236.)
In Ware (supra), members of a religious group called the *903 Plymouth Brethren challenged the New York Commissioner of Education’s regulation requiring all primary and secondary school students to receive instruction on AIDS. They claimed that the mandatory regulation violated their right to exercise their religious beliefs. A legitimate free exercise claim was recognized in Ware and Yoder (supra), since both cases involved a mandatory regulation which had the potential to completely undermine, as well as destroy, the parties’ religious beliefs. By contrast, the facts of the case at bar do not support a similar conclusion in light of the fact that the school program is voluntary. The school is not compelling the students to participate and sanctions are not imposed if they choose not to participate. As a result of these characteristics, a State benefit is not being conditioned upon conduct prohibited by one’s faith, nor is a benefit denied due to conduct mandated by one’s faith. Petitioners are not being asked to modify their behavior or violate their beliefs (Thomas v Review Bd., Ind. Employment Sec. Div., 450 US 707, 718). The respondents are neither preventing parents from teaching their children their religious beliefs, nor instructing them not to participate in the school program since it is contrary to those religious tenets. The parents are free to practice their religion on their own and/or with their children, to remind them of the moral and practical dilemmas surrounding premarital sex, and to teach them the doctrines of their religion regarding the use of condoms.
Since the program is voluntary, all the program does is expose the children to other ideas on the subject, distasteful as they may be to petitioners. Ware (supra) and other authority (see, Grove v Mead School Dist. No. 354, 753 F2d 1528, 1543, cert denied 474 US 826; Wilson v Block, 708 F2d 735, 741; Williams v Board of Educ., 388 F Supp 93, 96, affd 530 F2d 972; Davis v Page, 385 F Supp 395, 404) make it clear that exposure to other ideas found in school curriculum does not rise to the level of a free exercise claim. The program may arguably make it more difficult to practice one’s religion, but such burdens are merely incidental and do not rise to the level of free exercise violations (Smith v Board of Educ., 844 F2d 90, 94). In Smith, it was held that scheduling of a high school commencement exercise on Saturday was not a sufficient burden upon Orthodox Jews, who may be tempted to breach their faith by attending. Competition for the child’s attention and allegiance, standing alone, is no basis for a *904 constitutional infirmity. The facts sub judice are more akin to those in Doe v Irwin (615 F2d 1162), discussed herein below.
The court in Ware (supra) applied the United States Supreme Court’s two-part test in deciding whether an exemption from the school regulation was appropriate. First, the claimant must show that a sincerely held religious belief is burdened by a State requirement. Second, the State must then demonstrate that the requirement nonetheless serves a compelling State interest, and that an exemption would substantially impede fulfillment of that goal. (Ware v Valley Stream High School Dist., 75 NY2d, supra, at 123; see generally, Hernandez v Commissioner, 490 US 680 [1989]; Lyng v Northwest Indian Cemetery Protective Assn., 485 US 439 [1988] [evaluation of free exercise claims].) As to the former, the sincerity of the petitioners’ religious beliefs in the case at bar is not at issue; it is conceded by respondents and fully accepted by this court. On the "burden” issue, however, the possibility that the religious beliefs may be merely offended does not satisfy the requirement that those beliefs are unduly burdened. A central question to be answered in determining whether an unconstitutional burden is created was discussed in Rector of St. Bartholomew’s Church v City of New York (914 F2d 348, 355 [2d Cir 1990]): "The central question in identifying an unconstitutional burden is whether the claimant has been denied the ability to practice his religion or coerced in the nature of those practices.”
Petitioners have not been denied the ability to practice their religion nor are their children coerced into participating in the program which petitioners find contrary to their sincere religious beliefs. Although the petitioners argue that indirect coercion, mainly peer pressure and the school’s promulgation of the condom program, are subject to scrutiny under the First Amendment, the effects of the voluntary program are at best incidental. As articulated by the court in Lyng v Northwest Indian Cemetery Protective Assn. (supra, at 450-451), "[t]his does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into action contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions.”
3. Petitioners’ due process arguments.
A. The need for an opt-out provision.
*905 Petitioners took the position, at oral argument, that they do not want to set aside the entire condom distribution program; they merely want to impose an opt-out provision founded upon their protected due process rights to raise their children in the manner they deem appropriate.
In a written opinion to the Board of Education, the New York City Corporation Counsel advised the Board that if it, as a matter of policy, decided to implement a parental opt-out provision, it would likely be held constitutional and withstand judicial scrutiny. An opt-out provision was voted down by the board and never implemented. Therefore, the constitutionality of a parental opt-out provision is not at issue here.
Even if a parental opt-out provision is constitutional, it is not the role of the court to set policy on educational programs; such is the authority given to the respondents by law (Education Law § 2590-g [1]). The courts should not usurp the administrative functions by directing the Board of Education to proceed in a particular manner (Lipsman v New York City Bd. of Educ., 133 AD2d 810 [2d Dept]). Education officials are ordinarily vested with wide discretion in the management of school affairs (see, Matter of Board of Educ. v Ambach, 70 NY2d 501, 510-511) and the courts should not lightly intrude in the resolution of school conflicts, which are best left to education authorities (see, Board of Educ. v Nyquist, 57 NY2d 27, 38-39, appeal dismissed 459 US 1138).
In reviewing the Board’s action in this proceeding the court may not substitute what it might find to be a more desirable or acceptable program than that adopted by the Board.
In order to compel the respondents to implement an opt-out provision, petitioners must show some right to it as a matter of law. However, parents have no constitutional right to tailor public school programs to individual religious preferences (Ware v Valley Stream High School Dist., supra, at 125, citing Epperson v Arkansas, 393 US 97, 106).
Although the program may not include an opt-out provision parents are encouraged to participate in the process in numerous ways. Parents may serve as members of school-based planning teams. They serve in the Chancellor’s HIV/AIDS Advisory Council. Information providing professional suggestions for parents on how to discuss "difficult issues” concerning AIDS and condom use is available through forums, formation of PTA HIV/AIDS Parent Education Committees, and *906 parent orientation meetings. Parental involvement is a critical component of the HIV/AIDS Education Plan.
B. Petitioners’ due process rights to raise their children.
The constitutionally protected right to raise children as one sees fit (Meyer v Nebraska, 262 US 390; Pierce v Society of Sisters, 268 US 510; Matter of Marie B., 62 NY2d 352, 358) is not absolute, of course. (See, Prince v Massachusetts, 321 US 158, 166.) It cannot be credibly argued for example that the right to raise one’s children permits a parent to abuse or neglect the child. (See, Matter of Anthony L. ”CC”, 48 AD2d 415.) This is due to the recognized principle that children are also protected by the Constitution and have constitutional rights (Carey v Population Servs. Intl., 431 US, supra, at 692 [plurality opn]) which must be protected by all, including parents (Matter of Shane T., 115 Misc 2d 161). The right of privacy regarding decisions affecting procreation, and in particular the right to obtain nonmedical, nonprescription contraceptives, i.e., condoms, extends to minors as well as adults (Carey v Population Servs. Intl., supra, at 693 [plurality opn]).
Similarly, in Doe v Irwin (615 F2d 1162, cert denied 449 US 829), the petitioners, parents of minors, sued a family planning center, operated by the county under contract with the State of Michigan. The center was open to minors as well as adults, and no parental consent was necessary. Contraceptives were distributed free of charge, but only after individuals attended "rap sessions”, i.e., educational instruction dealing with birth control methods, responsibilities surrounding sexual activity, and concerns about communicating with parents.
An expert witness, on behalf of the parent petitioners, testified that in his opinion, "adolescents do not have sufficient maturity to utilize contraceptives for the purpose of preventing pregnancy”, and that the center’s approach "is viewed as a green light for the use of contraceptives.” (Supra, at 1164.) He further gave his view that "family stability and trust among family members are undermined by practices of the Center because parents feel that an outsider has usurped their rightful position of authority over their children.” (Supra, at 1164-1165.)
Another expert witness testified for plaintiffs in the Doe case (supra), one with experience in adolescent behavior. It was his stated opinion that "most adolescents do not have the capacity to make decisions on birth control and to understand what is involved in choosing or using a contraceptive.” (Supra, *907 at 1165.) He also testified that the center would be viewed by the teenagers as an authority figure " 'condoning fornication.’ ” (Supra, at 1165.)
The United States Court of Appeals held that the voluntary nature of the center left the petitioner parents free to exercise the traditional care, custody, and control over their children, so that it was not necessary to determine whether their rights as parents outweighed those of the minors, nor was it necessary to determine whether their rights were burdened by some compelling State interest.
As indicated heretofore, the voluntary aspect of the Board of Education’s program does not infringe upon the parents’ rights to raise their children or teach them the doctrines of their religious beliefs. There is no coercive effect to the program, no forfeitures exist for choosing not to participate, and the existence of the program in the schools is a mere exposure to other ideas. Even if an opt-out provision was adopted the exposure would still be present since the program would still continue in the school.
4. No evidentiary hearing is required.
In Ware (75 NY2d, supra, at 121), the petitioners, members of the Plymouth Brethern, alleged that respondents’ mandatory AIDS-related health instruction and the exposure thereto was inimical to their children’s religious, moral, ethical and personal well-being, and " 'would undermine the foundations of [their] faith and scar the moral values * * * instilled into [their] children’ ”. Further, they claimed that exposure to this type of mandated education "would undermine the Brethern’s ability to guide their children’s moral lives in accordance with their faith.” (Supra, at 121.)
The Court of Appeals withheld summary judgment, finding the existence of a factual question as to the extent of petitioners’ assimilation into the mainstream society. The Plymouth Brethern insisted that they were very much like the Amish in Yoder (406 US 205, supra), an isolated religious community. Respondents attempted to paint petitioners in Ware (supra) as fully integrated members of the community, living there, working there, taking in new members. The factual finding to be reached was crucial, for it directly affected the extent of the burden placed by the mandatory AIDS curriculum.
In the case at bar, petitioners do not allege, either in their petition or at oral argument that they are a community akin *908 to the Amish or the Plymouth Brethern. However, petitioners do have sincere, deep-rooted religious convictions concerning premarital sex and the use of condoms. This the court recognizes and accepts. Their sincere religious belief and their concern for the upbringing of their children is to be admired and respected and is not at issue in this proceeding.
At oral argument, petitioners specifically made it clear that the program at issue is an "impermissible burden on their due process and free exercise rights”, and in order to show such a burden, propose to have a psychologist or psychiatrist testify as to the program’s impact on the children and upon their relationship with their parents. Notwithstanding the sincerity and professional validity of these opinions, Doe makes it clear that the threshold question is whether there is an unconstitutional interference with the petitioners’ rights as parents, and none can be found where the program is voluntary (615 F2d 1162, supra). Consequently, Doe says, the "burden” questions and the "weighing” considerations are never reached, rendering the evidence offered by petitioners as not relevant as a matter of law. (Supra.)
Only when it is claimed that governmental action would substantially affect religious practice does a question of fact arise as to whether the State action interferes with the free exercise of religion. (Yonkers Racing Corp. v City of Yonkers, 858 F2d 855, 871, cert denied 489 US 1077.)
As indicated hereinabove, the program at issue, being voluntary in nature, at best creates only an incidental effect on petitioners’ ability to practice their religion, because it has no tendency to coerce individuals to act contrary to their religious beliefs (Lyng v Northwest Indian Cemetery Protective Assn., 485 US, supra, at 450). Without any tendency to coerce, the voluntary program cannot rise to the level of having a "substantial effect” on religious practice. Therefore, there are no issues of material fact which would require an evidentiary hearing.
The court’s role is to determine whether the program at issue violates any constitutional rights of the petitioners or is prohibited by statute, and where, as here, no such violation or prohibition has been found, the court’s inquiry ends. The courts should refrain from legislating or interpreting which would have the effect of legislating (see, Matter of Anonymous [St. Christopher’s Home], 40 NY2d 96). The statute (or as here, a policy) must be read and given effect as written, and not as *909 the court may think it should have been written, or would have been written had all problems which might arise been envisioned (Parochial Bus Sys. v Board of Educ., 60 NY2d 539). The court’s function is to construe and interpret, not to decide the wisdom and propriety of an enactment. (Matter of Cristo Bros., 97 AD2d 274, affd 64 NY2d 975; Board of Educ. v City of New York, 41 NY2d 535, 538-539, n 2, quoting Matter of Rosenthal v Harnett, 36 NY2d 269, 273; see also, Palmer v Ticcione, 576 F2d 459, 464-465.)
For these reasons, the petition seeking an order (1) declaring the plan to be a health service, (2) enjoining the implementation of the program unless the minors’ parents have consented, (3) requiring parental consent for the plan under Public Health Law § 2504, and (4) declaring the implementation of the plan to be a violation of the parents’ constitutional and civil rights, under the United States and New York State Constitutions, is denied in all respects, and this proceeding is hereby dismissed.