OPINION OF THE COURT
Joseph A. DeMaro, J.
This is a proceeding by the maternal grandmother of two *255 children for an order of this court to provide her with visitation with the children over the objection of the children’s father, the respondent.
The court heard from 12 witnesses including the parties, family members, the independent forensic evaluator and the experts retained by each party. The matter was heard on March 13, 16 and April 10, 1992.
The parties were represented by private counsel and an experienced Law Guardian represented the children. The probation report and forensic evaluation reports were a court exhibit pursuant to the stipulation of the parties.
Respondent married petitioner’s daughter Paula in 1989. There are two children of their marriage, Arnold, born May 1989 and Alice, born July 1990.
In December 1990, Paula disappeared. At the time of her disappearance, Arnold was 18 months old and Alice was 5 months old. The investigation of this disappearance is an open police matter; respondent has never been charged with any complicity in the occurrence. A petition brought by petitioner herein seeking custody of the children based on the principles of Matter of Bennett v Jeffreys (40 NY2d 543 [1976]) was dismissed by the court as conclusory (order dated Dec. 2, 1991). There is no petition against respondent under article 10 of the Family Court Act; therefore respondent is, in the eyes of the law, a fit parent with custody of his two children. In February 1991, and thereafter, respondent refused to allow visitation between petitioner and the children. Respondent avers that petitioner has accused him and told others that he had caused Paula’s disappearance and he fears petitioner will convey such feelings to the children if allowed visitation. Petitioner filed visitation petitions in the Family Court and by temporary order made on May 18, 1991 Judge Decker of this court granted petitioner supervised visitation at E.A.C., 50 Clinton Street, Hempstead, New York. By order dated December 2, 1991, this court terminated the court-ordered visitation.
Domestic Relations Law § 72 sets forth the criteria in grandparent visitation matters. (See, Emanuel S. v Joseph E., 78 NY2d 178 [1991].) The statute sets forth two alternative conditions before the children’s best interest may be considered; one of the child’s natural parents is dead or "circumstances show that conditions exist which equity would see fit to intervene.” (Domestic Relations Law § 72.)
At the end of the proceedings on March 16, 1992, this court *256 decided that the disappearance of Paula was the kind of circumstance that would prompt equity to intervene. The court further found that the actions of the petitioner wherein she expressed her view that respondent was involved in Paula’s disappearance, were not sufficient to deny her equitable consideration on the "clean hand” and/or "he who seeks equity must do equity” bases.
The court, therefore, must address the best interest consideration. The usual issues relating to best interest involve natural parents and are geared toward determining the form of visitation best suited for the child. With natural parents, there is a very strong presumption that visitation should take place. Indeed it is said that a complete denial of visitation between a child and a natural parent is a drastic measure. (Nacson v Nacson, 166 AD2d 510 [2d Dept 1990].)
The considerations for grandparent visitation are different. Grandparent visitation is a creature of statute; the parent-child relationship however precedes government itself and has been described as an "intrinsic human right.” (Smith v Organization of Foster Families, 431 US 816, 845.) A fundamental constitutional right regarding grandparents and grandchildren as similar to that between a parent and child has not been articulated. When considering the "best interest” issue as to natural parents, the importance and veneration given to the relationship and often the severe psychological impact of severing such relationship often prompts the court to provide visitation even though there may be attendant short-term complications and problems (i.e., supervised — or other restrictions). The "problems” are dealt with because the objective is to establish and/or maintain the life-long natural bond in child-parent relationships. Furthermore, it has been established that if the bond is broken it may cause the child psychological damage at some later point in his or her life. In grandparent matters, the best interest question involved is much more objective and "now” oriented. Is it beneficial to this child to visit with this grandparent now? The relationship is indeed important, but the parent-child bond is inestimably more important by tradition and by simple reality, than that of the grandparent-child.
The testimony demonstrated that prior to the disappearance, petitioner had substantial contact with the children and that it was positive in nature. Since the disappearance she has felt that respondent caused the disappearance and has articulated that feeling to respondent and to others.
*257 The court finds, on the basis of the reports and testimony of Joseph Schechter and Ellen Rosenstein (the independent forensic evaluator and probation investigator respectively) that petitioner’s feelings about respondent are very intense, and that her daughter’s disappearance having been without any finality, has made it more difficult for her to come to terms with it.
Mr. Schechter opined that respondent’s relationship with the children is of crucial importance. There is a need for the children to bond to him as their primary caretaker, replacing Paula who is no longer in their lives. Further, he testified, that respondent is also going through a difficult time as he becomes the primary caretaker of his children while at the same time suffering the severe stressor in the loss of his wife.
Dr. Nola Nauryon (an expert witness) testified for respondent. She opined that the court-ordered visitation would add great stress to the loss of his wife. She opined that placing such stress on him would impact directly on the children and would adversely affect his ability to address their needs. Dr. Nauryon was not an independent evaluator but the court found her professional and credible.
The court has observed the petitioner both directly as a witness and through the eyes of other witnesses. The court finds on the basis of all the testimony that while she understands the importance of the bond between respondent and the children she would attempt to replace Paula in their feelings and she would not be able to avoid conveying her intense feelings against respondent to them.
In two significant ways visitation would be detrimental to the children: first, it would directly interfere with the parental relationship and confuse the children in their relationship and feelings for their father; and, second, it would create great difficulty for respondent in his efforts to properly raise the children.
All of the independents, including the Law Guardian, recommended supervised visitation.
Supervised visitation is a device used to maintain parental contact when it is felt that the child would come to some harm if a third person were not present. It is meant to overcome short-term problems between parent and child — a bridge to shore up and assist the long term relationship above described. While a recommendation for supervision does not per se negate best interest, such is a clear finding that the *258 children would be at risk if left in petitioner’s control without the protection of another person. The risk here is that petitioner would convey her feelings to the children and thus undermine respondent’s relationship with them. The credible evidence supports this trepidation.
Of course, mere animosity between parent and grandparent is not sufficient to determine that it is not in the children’s best interest to visit the grandparents (Matter of Vacula v Blume, 53 AD2d 633 [2d Dept 1976]; Lo Presti v Lo Presti, 51 AD2d 578 [2d Dept 1976]). Animosity, however, is very different from accusations of uxoricide especially where there is a danger, as here presented, in undermining the relationship already so vulnerable due to the disappearance of the mother.
Though the primary focus is the children’s best interest, the mental status of the respondent is not irrelevant to these proceedings. Indeed as primary caretaker, his over-all situation is of singular import and also redounds upon the children’s best interest.
The court finds that visitation with petitioner would also adversely affect respondent’s relationship with his children and his ability to guide and move them through this time when they too suffer the loss of their mother.
The risks are real, not illusory. The court cannot justify placing these children at further risk in view of the loss they have already suffered.
The court finds that it is not in the best interest of the Jones children to visit with petitioner. The petition is dismissed. The court has rejected the recommendations of both the independent evaluators and the Law Guardian, all of whom recommended supervised visitation because of its determination that the risk to the children is more intense than alluded to by the independents and the effect on respondent and his ability to be the primary caretaker has not been given sufficient weight by them.
Section 72 of the Domestic Relations Law has forced this court to decide "best interest” issues not as and between adversarial natural parents and not for any compelling abuse or neglect situation (Family Ct Act § 1012). While the court has followed the mandates of section 72, it did so with great discomfort.
The court would be remiss if it did not allude to its trepidation in usurping the prerogative of a natural parent with custody in deciding what’s best for his/her child.
*259 The nature of family life and its relationship with the State has received numerous pronouncements on both the Federal and State level. The Supreme Court has addressed family matter issues on numerous occasions. In Smith v Organization of Foster Families (431 US 816, 845, supra), the Court held the "liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in 'this Nation’s history and tradition’.” (Moore v East Cleveland, 431 US 494, 503; see also, Wisconsin v Yoder, 406 US 205; Pierce v Society of Sisters, 268 US 510, 518; Meyer v Nebraska, 262 US 390; Ginsburg v New York, 390 US 629; Smith v Organization of Foster Families, 431 US 816, supra; Bellotti v Baird, 443 US 622, 638.)
We know from pronouncements by the Court that the privacy right of parenting is not absolute and that there is a role of "parens patriae” appropriate to the State. The State’s role was addressed in Prince v Massachusetts (321 US 158, 166), where the Court stated: "Acting to guard the general interest in youth’s well being, the state as parens patriae may restrict the parent’s control by requiring school attendance, regulating or prohibiting the child’s labor and in may other ways.”
Even where the State’s power exists in an area like compulsory education such power must be "rights” sensitive (Pierce v Society of Sisters, supra; Ware v Valley Stream High School Dist., 75 NY2d 114 [1989]). We don’t speak here of the type of issues which affect "fitness”, or neglect (Family Ct Act § 1012 [f]) — food, clothing, shelter, education, medical, dental, optometrical or surgical care (Family Ct Act § 1012 [¶] [i] [A]); nor do we speak of a parent or parents who exercise excessive corporal punishment, or misuse of drugs and/or alcohol (Family Ct Act § 1012 [¶] [i] [B]). These are areas where the Legislature has most appropriately set criteria for involving the State in the child-parent relationship (Family Ct Act art 10). There is no issue herein regarding such lack of fitness.
In Domestic Relations Law § 72 cases, the State has determined that on the criteria of equity, and best interest (both of which terms are extremely vague [Smith v Organization of Foster Families, supra, at 835, n 36]) that it may require a parent with custody to provide visitation to a person other than another parent. Grandparents and siblings are unique in this situation. We know that to a stranger to a child’s blood, *260 no matter that equity and best interest may scream for a forum as in Matter of Alison D. v Virginia M. (77 NY2d 651 [1991]) the court will not consider awarding visitation (see also, Ronald FF. v Cindy GG, 70 NY2d 141 [1987]). It is clear that there is no Bennett v Jeffreys (40 NY2d 543, supra) rule in visitation matters that will permit a nonparent such relief when the parent is not unfit.
It appears to this court that a parent with custody, whose right to parent has not been limited by an article 10 proceeding or whose custody has not been abrogated pursuant to Bennett v Jeffreys (supra), may not have his best interest decisions as to whom his children have contact with replaced by this court’s concept of "best interest.” Even with regard to grandparents and siblings this court finds that States do not possess some all-encompassing general parens patriae role in parenting (cf, Lehrer v Davis, 214 Conn 232, 571 A2d 691; Barry v Barrale, 598 SW2d 574 [Mo]; DeWeese v Crawford, 520 SW2d 522 [Tex]). Such role though permitted is limited. Clearly, it is in the best interest of an overwhelming percentage of children to have ongoing, frequent contact with aunts, uncles, cousins, grandparents, etc., but with whom a particular child has contact must be decided by the parents of the child, not by a court such as this. As the State interest is not "compelling”, this court verily believes that Domestic Relations Law § 72 is repugnant to the privacy rights of citizens as assured under the US Constitution’s 14th Amendment (and 9th Amend). (Roe v Wade, 410 US 113.)
On a much less technical basis but more traditional one — it simply violates the citizen-Government contract. The State was not established to tell us who we and our children must associate with.
The downside of the presumption of constitutionality (People v Pagnotta, 25 NY2d 333 [1969]) and reluctance of courts of original jurisdiction to strike statutes on such grounds is that the rules involved govern the affairs of men and women often without review by a State’s higher court for years and years.