LOUIS COHEN, Plaintiff, *v.* THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, Defendant.

Supreme Court, New York County, January 25, 1934.

*Samuel Segal,* for the plaintiff.

*Douglas Swift,* for the defendant.

SHIENTAG, J. Two questions are presented on this motion to dismiss the complaint: *First,* whether an emancipated minor may establish a domicile separate and apart from that of his parent; and, *second,* whether the courts of this State will, in their discretion, take jurisdiction of an action for personal injuries against a foreign railroad corporation doing business in this State, where the

accident occurred in the State of New Jersey and where at the time of its occurrence plaintiff was domiciled in this State, but was a non-resident when the action was commenced.

It is urged that in no event did the minor have a right to establish an independent domicile; that, regardless of where he actually lived, his domicile, in the eyes of the law, was that of his surviving parent, his mother, in the State of New Jersey.

The plaintiff was born in Philadelphia on April 18, 1911. He was a posthumous child. His father, up to the time of his death, had been domiciled in Pennsylvania, and his mother continued to maintain her domicile in that State. The minor's mother before she remarried changed her domicile to the State of New Jersey. On her remarriage she continued to live in New Jersey, and plaintiff lived with her and his stepfather. Plaintiff claims that when about eighteen years of age he obtained the status of an emancipated minor, left the parental roof, with his mother's approval and consent, and came to this State, where he lived with an aunt, earning his own livelihood, paying the expense of his maintenance and upkeep and looking after his education. That, he claims, was the situation up to and including the day of the accident. On August 23, 1930, a Saturday afternoon, he went from his place of employment in New York city to visit his mother in Chatham, N. J., and was injured while a passenger on one of the defendant's trains before he arrived at his destination.

There being a dispute concerning the facts, the matter was referred to a referee for hearing and report. The referee, after correctly applying the rules of law in point, found that on the day of the occurrence of the accident, and for some time prior thereto, plaintiff was domiciled in the State of New York, and had the status of an emancipated minor. Those findings are amply supported by the evidence and are adopted by this court.

The learned referee further reported that, in his opinion, an emancipated minor had the right to establish an independent domicile, separate from that of his parent, and recommended that the courts of this State take jurisdiction of the plaintiff's action for personal injuries.

It is with that legal proposition that this opinion deals. "The question is an interesting one which leads into the shadow land whence legal fictions have their origin." (*Matter of Thorne*, 240 N. Y. 444, 447, per POUND, J.)

The domicile of origin of a child born in wedlock is that of his father. If the domicile of the father changes during the child's minority, that of the child likewise changes by operation of law, regardless of the consent or desire of the parties. (*Ryall* v.

*Kennedy,* 67 N. Y. 379, 386.) Although the child is in fact living apart from his father, his legal domicile is, nevertheless, with the father. The child cannot acquire an independent domicile by any will or act of his own.

In this case the father died before the child's birth. The infant's domicile was, therefore, in law that of his mother. (*Lind* v. *Sullestadt,* 21 Hun, 364, 366.)

It is unnecessary to consider what effect the remarriage of a mother would have on the child's domicile. Here the mother was, in fact, domiciled in the State of New Jersey before and after her remarriage. (*Lamar* v. *Micou,* 112 U. S. 452, 470; 114 id. 218.)

Why, at common law, was the domicile of an infant necessarily that of the father? Judge POUND in *Matter of Thorne (supra)* answered: " Not because the child actually resides with him and is a part of his family. Rather because of the *patria potestas* of the father; the tutelage of the child and the headship of the family of which the child is a part; the reciprocal rights and duties of father and child " (p. 447).

In his dissenting opinion in the same case, LEHMAN, J., said: " While the domicile of the infant does not depend either upon the physical presence of the infant or upon the infant's intention, the rules governing the infant's domicile are not entirely artificial or arbitrary. The law places the infant's home at the home of his parent or parents, because to some extent it regards the family as inseparable and that is the place where an infant would naturally reside, since the infant may not decide for himself where he will permanently reside " (p. 451).

Professor Beale says: " The legal inseparability of father and child is essential to their mutual legal obligations; to the parental government, to the discharge of the duties which the father owes the child, and to the rendition of the service which the child owes the father." (Beale, Domicile of an Infant, 8 Cornell Law Quar. 103, 104.)

The basis of the rule with respect to an infant's domicile is, therefore, not so much lack of capacity on the part of the infant, as the relationship of parent and child with its interdependent duties and obligations.

In dealing with the relationship of parent and child, Blackstone takes up, *first,* the legal duties of parents to their children; *second,* their power over them; *third,* the duties of children to their parents. The duties of parents to children, he writes, " principally consist in three particulars; their maintenance, their protection, and their education." The power of parents over children, he says, is derived from their duty; " this authority being given them, partly to enable

the parent more effectually to perform his duty, and partly as a recompense for his care and trouble in the faithful discharge of it." The ancient Roman laws, we are told, gave the father a power of life and death over his children " upon the principle that he who gave had also the power of taking away," a barbarous power softened by subsequent constitutions.

The power of a parent under the English law, while much more moderate than that which prevailed under the Roman, was " still sufficient to keep the child in order and obedience. The duties of children to their parents arise from a principle of natural justice and retribution." (1 Blackstone, chap. 16, 447, 452, 454.)

Professor Beale summed it up when he wrote: " The *patria potestas* of the father then involves two elements; tutelage of the child and headship of the family of which the child is a part. Not only is the father's will supreme over the minor child, except where restrained by some provision of law, and not only therefore does he determine where the infant shall live; mutual obligations bind the two together and compel the infant to live with him, and him to take the infant into his house." (Beale, *op. cit.*, p. 103.)

That a minor child may be emancipated by its parents' consent, express or implied, is well-established law. (*Stanley* v. *National Union Bank*, 115 N. Y. 122, 134.) The meaning of emancipation is not that all of the disabilities of infancy are removed, but that the infant is freed from parental control, and has a right to his own earnings. (*Commonwealth* v. *Graham*, 157 Mass. 73, 76.)

Some courts have gone so far as to say that emancipation severs the father-child relationship for all purposes. (*Memphis Steel Const. Co.* v. *Lister*, 138 Tenn. 307.) " It leaves the child, so far as the parent is concerned, free to act upon its own responsibility, and in accordance with its own will and pleasure, with the same independence as though it were twenty-one years of age." (*Lowell* v. *Newport*, 66 Me. 78, 90.) It is unnecessary to define the status so broadly.

The effect of emancipation is to deprive the parent of control over the child, so long as the emancipation continues. It involves a surrender of the right to the care, custody and earnings of the child, as well as a renunciation of parental duties. The child becomes entitled to his time and his earnings and to property purchased from his earnings, free from any claims of the parent or the parent's creditors. (*Shute* v. *Dorr*, 5 Wend. 204; Madden Dom. Rel. 409.) " The best test which can be applied is the separation and resulting freedom from parental and filial ties and duties which the law ordinarily bestows at the age of majority." (*Lowell* v. *Newport*, *supra*, 90.) So far as the parent is concerned,

the child is thrown upon his own resources and is free to act upon its own responsibility and in accordance with its own desires.

Recognizing that, as general rule, the family circle is the best place in which to train and bring up children, it is against the policy of the law to force or even to encourage the separation of families against the will of those interested. It will, under proper safeguards, permit the parties themselves to bring about the separation, which not infrequently may be demanded by economic conditions and may be useful to all concerned. So it has been held that the marriage of a minor operates as an emancipation, and this even though the parent is opposed to the marriage. (*Cochran* v. *Cochran*, 196 N. Y. 86; *Town of Sherburne* v. *Town of Hartland*, 37 Vt. 528.)

If, therefore, the *patria potestas* of the father is in the main the basis of the common-law holding that the domicile of an infant is necessarily that of the father, and if by the process of emancipation the father relinquishes his power and control over the infant, it would seem logical, as well as desirable, to give to an emancipated minor who has reached the age of discretion the power to select his own domicile. Strangely enough, there is little binding authority on this point. No controlling adjudication on the subject in this State has been brought to my attention.

Professor Beale supports the right of an emancipated infant to establish an independent domicile. " A father may by the consent of a child ' give a child his time,' or, to use the legal term, may emancipate him; after which the father ceases as between the two to be obliged to support the child, and on the other hand the child's earnings belong to himself. The child, upon emancipation, ceases to be a part of the father's family, and a subsequent change of domicil by the father does not change the domicil of the child. A child so emancipated by his parents' consent may, it is usually held, acquire a new domicil of his own." (Beale, *op. cit.*, p. 105.)

Goodrich says: " There is good authority that after emancipation a minor who has attained years of discretion, may acquire a separate domicile. By such emancipation the minor goes on his own responsibility, freed from parental authority, control and assistance. The law in recognizing the minor's separate domicile merely gives legal effect to what is already the fact, his independent existence." (Goodrich Confl. of Laws, § 34. See, also, Whart. Confl. of Laws, § 41.)

The proposed Final Draft No. 1 (1930) of the Restatement of the Law dealing with Conflict of Laws, provides:

§ 33. An emancipated minor child can acquire a domicile of choice.

The French Civil Code recognizes the right of an emancipated minor to acquire an independent domicile. (Art. 108 of title third — of Domicile.)

The cases on the subject, surprisingly few in number, are in conflict. Those supporting the right of an emancipated infant to establish a domicile of choice are *Russell* v. *State* (62 Neb. 512, 516); *Van Matre* v. *Sankey* (148 Ill. 536, 556); *Bangor* v. *Readfield* (32 Me. 60); *Lewis* v. *M., K. & T. Railway Co.* (82 Kan. 351); *Hess* v. *Kimble* (79 N. J. Eq. 454); *Bjornquist* v. *Boston & A. R. Co.* (250 Fed. 929); *Woolridge* v. *McKenna* (8 id. 650). *Contra: Gulf, C. & S. F. Ry. Co.* v. *Lemons* (109 Tex. 244); *Delaware, L. & W. R. R. Co.* v. *Petrowsky* (250 Fed. 554).

In *Gulf, C. & S. F. Ry. Co.* v. *Lemons* (*supra*) the court, after an analysis of the problem, holds squarely that emancipation does not give a minor the right to choose an independent domicile. The ruling is based, in large measure, on the proposition that a minor, regardless of age or status, suffers in the eyes of the law from an incapacity to select his own domicile. " It is obvious," says the court, " that the disability of a minor to effect a change of domicile by act of his will rests at least in large measure on his presumed lack of capacity to form the intention, which is the all important element in effecting such a change, and the law makes no distinction with respect to this lack of capacity at the varying stages of minority, the presumption being the same at eighteen years as at eighteen months " (p. 248). The court then goes on to say that by emancipation the father merely gives up his right to the benefit of the infant's labor and earnings, but does not surrender his right to the custody and control of the person of his minor child, a view of the effect of emancipation at variance with that commonly accepted. (See, on this point, *Delaware, L. & W. R. R. Co.* v. *Petrowsky*, 250 Fed. 554, 559, and cases cited.)

In Texas, it should be noted, there is a prescribed statutory procedure for the removal of an infant's disabilities.

The case of *Delaware, L. & W. R. R. Co.* v. *Petrowsky* (*supra*) did not pass squarely upon the point. It did not recognize the right of an emancipated infant to acquire an independent domicile, but held that when a father relinquished his minor child to one who agreed to assume the parents' duty during the child's minority the child took the domicile of the person assuming this responsibility. It relies apparently on the incapacity of the infant, seventeen years of age, although emancipated, to acquire a domicile, and on the *patria potestas* of the father transferred to an older brother who assumed responsibility for the minor. The case has not escaped criticism on both points. (See Goodrich Confl. of Laws, § 34 b.),

If we consider the inability of a minor to acquire a domicile of choice as having its basis in the *patria potestas* of the father, in the legal inseparability of father and child so essential to their mutual legal obligations, emancipation, while it continues, puts an end to the power and control of the father over his child and undermines, if it does not entirely wipe out, their mutual legal rights and duties.

While the relationship of husband and wife is by no means analogous to that which we are here considering, it would be well to note what Mr. Justice HOLMES said in support of a holding by a unanimous court, that in this country, a wife who has justifiably left her husband may acquire a separate domicile, not only for the purpose of obtaining a divorce from him, but for all purposes. " The only reason that could be offered for not recognizing the fact of the plaintiff's actual change, if justified, is the now vanishing fiction of identity of person. But if that fiction does not prevail over the fact in the relation for which the fiction was created there is no reason in the world why it should be given effect in any other." (*Williamson* v. *Osenton*, 232 U. S. 619, 625.)

If an emancipated minor is to be denied the right of a domicile of choice, because of the ancient rule that he is *non sui juris*, it would be well to invoke the maxim that legal principles must not be carried to their extreme consequences, regardless of good sense. A principle valid within certain limits becomes false when applied beyond those limits. The law should avoid the falsehood of extremes. An infant on attaining years of discretion has the capacity to commit a crime; he is liable for his torts; when suit is brought on his behalf for negligence he is deemed to be *sui juris*, so far as responsibility for his own negligent acts is concerned; he is permitted to enter into the most sacred contractual relationship known to law — marriage; to assume responsibility for and exercise power over his own children; he has sufficient capacity to be chargeable on the basis of *quasi contract* for necessaries and for obligations incurred by him in the discharge of duties imposed by law. He has the capacity to enter into contracts generally; his infancy is no ground for repudiation by the other contracting party. That the minor may disaffirm his contracts under certain conditions is due, not so much to his disability as to a privilege which the law extends for his protection. A minor of the age of eighteen years may, by will in writing, dispose of his personal estate. A child who has been emancipated may contract with his parent to perform services for him for hire, and the contract is enforcible in law against the creditors of the parent. (*Stanley* v. *National Union Bank*, 115 N. Y. 122.) To maintain the ancient rule in all its rigor is to close our eyes to the facts of life, " to put symmetry in the first place

and efficiency in the second;" to allow reality to be crushed by dogma.

The problem here presented " is a striking instance of the dangers of ' a jurisprudence of conceptions,' * * * the extension of a maxim or a definition with relentless disregard of consequences to ' a dryly logical extreme.' " (*Hynes* v. *New York Central R. R. Co.*, 231 N. Y. 229, 235, per CARDOZO, J.)

The learned referee in his report said: " The plaintiff was over eighteen years of age and a high school graduate when emancipated, and if he had mind and intent enough to earn his own living, to support himself, to attend a college of electrical engineering five evenings in the week, to enter into business transactions, to save money, to pay his board regularly to his aunt, to act in all respects as a diligent, honest, law abiding member of the community in Brooklyn, New York, there would seem no sound reason why he could not acquire his own domicile under such circumstances." With that conclusion I agree.

While the accident occurred outside the State and the defendant is a foreign railroad corporation organized under the laws of Pennsylvania, it should be noted that the complaint alleges, and the answer admits, that the defendant " maintained an office and place of business, as well as a substantial part of its road bed, rolling stock, and equipment, within the state of New York." The accident occurred in New Jersey, at a point about twenty-five miles from New York city. It occurred while the plaintiff was on his way from New York to visit his mother in New Jersey. Assuming that after the accident the plaintiff, helpless with his leg amputated, acquired a residence of necessity in New Jersey with his mother, he, in fact, was domiciled in this State when his cause of action arose and, in the exercise of discretion, the courts of this State should take jurisdiction of the action. (*Murnan* v. *Wabash Ry. Co.*, 222 App. Div. 833; revd., 246 N. Y. 244, 248; 226 App. Div. 753; appeal dismissed, 251 N. Y. 547; *Waisikoski* v. *Phila. & Reading R. R. Co.*, 173 App. Div. 538; affd. on opinion of JENKS, P. J., 228 N. Y. 581.) To do so would, under the circumstances here presented, not be an undue burden or hardship on a foreign railroad corporation engaged in interstate commerce within the rules laid down in *Denver & Rio Grande W. R. R. Co.* v. *Terle* (284 U. S. 284) and *Michigan Central R. R. Co.* v. *Mix* (278 id. 492). If the discretion of the court is to be invoked, it would seem to be the better policy to take jurisdiction in a situation of this kind where at the time of the occurrence of the accident the plaintiff was domiciled here, rather than in a case where he moved here after the accident.

The report of the referee is confirmed. The motion to dismiss the complaint is denied, with ten dollars costs. Order signed.