[606 NYS2d 259]

In the Matter of IGNACIA ALFONSO et al., Appellants, v JOSEPH A. FERNANDEZ et al., Respondents.

Second Department, December 30, 1993

**APPEARANCES OF COUNSEL**

*Donovan, Leisure, Newton & Irvine,* New York City *(Paul A.*

*Crotty, Patrick J. Sullivan, Jana L. Van Tatenhove* and *Sundria R. Lake* of counsel), for appellants.

*O. Peter Sherwood, Corporation Counsel* of New York City *(Doron Gopstein* and *Fred Kolikoff* of counsel), for respondents.

*New York Civil Liberties Union Foundation,* New York City *(Catherine Weiss, Donna Lieberman* and *Arthur N. Eisenberg* of counsel); *AIDS Project, American Civil Liberties Union Foundation,* New York City *(William B. Rubenstein* and *Ruth E. Harlow* of counsel); *Berle, Kass & Case,* New York City *(Jean M. McCarroll* and *Deborah Goldberg* of counsel), and *Planned Parenthood Federation of America,* New York City *(Roger K. Evans* and *Beth Otten* of counsel), for The New York Civil Liberties Union and others, *amici curiae.*

**OPINION OF THE COURT**

PIZZUTO, J.

Today, we hold that the respondents are prohibited from dispensing condoms to unemancipated minor students without the prior consent of their parents or guardians, or without an opt-out provision. Condom distribution in the public schools is a health service rather than health education and thus, in the absence of a provision requiring the prior consent of unemancipated minor students' parents or guardians, or in the absence of an opt-out provision, lacks common-law or statutory authority. In addition, the respondents' plan to dispense condoms to unemancipated minor children without the consent of their parents or guardians, or an opt-out provision, violates the civil rights of the parent petitioners and similarly situated parents or guardians under the substantive Due Process Clauses of the Fourteenth Amendment of the United States Constitution and New York Constitution, article I, § 6.

THE FACTS

In September 1987 the New York State Commissioner of Education directed all elementary and secondary schools to include, as part of health education programs, instruction concerning the Human Immunodeficiency Virus (HIV) which causes Acquired Immune Deficiency Syndrome (AIDS) *(see,* 8 NYCRR 135.3 [b] [2]; [c] [2]). In late 1990, Joseph Fernandez, then Chancellor of the New York City Board of Education, suggested enlarging the existing HIV/AIDS curriculum to impart additional education about the transmission and pre-

vention of HIV/AIDS. The former Chancellor also suggested that condoms be made available to high school students upon request. On February 27, 1991, the New York City Board of Education voted to establish an expanded HIV/AIDS education program in New York City's public high schools, consisting of two components.

The first component calls for classroom instructions on various aspects of HIV/AIDS. Each public high school is required to adopt a curriculum which incorporates lessons on the various means by which one could be infected with HIV, and the methods of prevention. Abstinence from sexual activity is to be stressed. This component of the program is mandatory, but includes a parental opt-out provision whereby a parent may opt his or her minor unemancipated child out of the classroom instruction upon the assurance that the child will receive such instruction at home.

The second component of the program calls for the high schools to make condoms available to students who request them. Public high schools are to establish health resource rooms where trained professionals are to dispense condoms to students who request them. A student to whom condoms are dispensed must be given personal health guidance counselling involving the proper use of condoms, and the consequences of their use or misuse. Students are not required to participate in this component of the program and no sanction is imposed on a student who does not do so. Most importantly, this component of the respondents' program does not include a provision for parental consent or opt out.

The petitioners, who are parents of New York City public school students, then commenced this hybrid proceeding and action, *inter alia,* to prohibit the implementation of the condom availability component of the expanded HIV/AIDS education program in New York City's public high schools.

The petitioners contend that implementation of the condom availability component of the program: (a) violates Public Health Law § 2504, because it constitutes "health services" to unemancipated minor children without the consent of their parents or guardians, and therefore is not authorized by law, (b) violates their due process rights to direct the upbringing of their children, and (c) violates their rights to the free exercise of their religion as guaranteed by the First Amendment of the United States Constitution and New York Constitution, article I, § 3.

Intense controversy has surrounded the expanded HIV/AIDS education program. The impetus for the program is a deadly public health threat of epidemic proportions. New York City teenagers allegedly account for 20% of the reported cases of adolescent AIDS in the United States, although they make up only 3% of the nation's teenagers. The supporters of the condom availability component of the plan view it as a legitimate and necessary part of public school health education directed at control of a public health crisis. On the other hand, many persons are concerned that the condom availability component of the plan is tantamount to condoning promiscuity and sexual permissiveness, and that the exposure to condoms and their ready availability may encourage sexual relations among adolescents at an earlier age and/or with more frequency, thereby weakening their moral and religious values. They doubt the wisdom or the desirability of a public school system engaging in what they view as a controversial social program peripheral to the immediate task of educating children.

In this controversy, the Court's role is a limited one. Its function is to determine whether or not the condom availability component of the program impermissibly trespasses on any of the petitioners' constitutional, common-law, or statutory rights. That role begins with its review of the record and ends with its determination of the legal issues. It is without power to legislate.

### THE RIGHT OF PARENTS TO CONSENT OR WITHHOLD CONSENT TO THE RENDITION OF HEALTH SERVICES TO THEIR CHILDREN

■ At common law it was for parents to consent or withhold their consent to the rendition of health services to their children. The general incapacity of minors to consent to health services derives from this common-law rule that treated a minor's "normal condition [as] that of incompetency" (66 NY Jur 2d, Infants And Other Persons Under Legal Disability, § 3; *see also, Bonner v Moran,* 126 F2d 121 [applying common-law rule requiring consent of parent to surgery performed on minor and reviewing relevant State cases]). As legal incompetents, minors could no more consent to medical treatment than they could enter into binding contracts and they continued to be incompetent in many

circumstances to give effective consent to health care. The courts identified exceptions to the common-law rule regarding the incapacity of minors. For example, children were regarded as emancipated and competent to consent when they were married (see, *Cochran v Cochran*, 196 NY 86); or supported themselves (see, *Cohen v Delaware, Lackawanna & W. R. R. Co.*, 150 Misc 450); or were inducted into military service (see, *Matter of Fauser v Fauser*, 50 Misc 2d 601); or when their parents abandoned them or failed to support them (see, *Murphy v Murphy*, 206 Misc 228). In addition, a physician could render health services to a minor in an emergency without first consulting his or her parents.

Public Health Law § 2504, which was enacted in 1972, codified some but not all of the common-law exceptions to the general incapacity of minors. That section dispenses with a parental consent requirement for "medical, dental, *health* and hospital *services*" (emphasis supplied) in five enumerated instances, none of which are applicable here. It reads as follows:

"1. Any person who is eighteen years of age or older, or is the parent of a child or has married, may give effective consent for medical, dental, *health* and hospital *services* for himself or herself, and the consent of no other person shall be necessary.

"2. Any person who has been married or who has borne a child may give effective consent for medical, dental, *health* and hospital *services* for his or her child.

"3. Any person who is pregnant may give effective consent for medical, dental, *health* and hospital *services* relating to prenatal care.

"4. Medical, dental, *health* and hospital *services* may be rendered to persons of any age without the consent of a parent or legal guardian when, in the physician's judgment an emergency exists and the person is in immediate need of medical attention and an attempt to secure consent would result in delay of treatment which would increase the risk to the person's life or health.

"5. Anyone who acts in good faith based on the representation by a person that he is eligible to consent pursuant to the terms of this section shall be deemed to have received effective consent" (emphasis supplied).

The petitioners argue that the distribution of condoms to high school students is a health service, that such distribution does not fall within any of the exemptions set forth in Public

Health Law § 2504 to the common-law requirement of parental consent, and therefore, that parental consent is required. The respondents argue that the distribution program is not a "health service" but merely an "adjunct to an education program" or an "aspect of instruction in disease prevention". Thus, the first issue which we must decide is whether or not the condom availability component of the respondents' plan is a health service. We conclude that it is.

The condom availability component of the respondents' program is not merely education, but is a health service to prevent disease by protecting against HIV infection. In the words of Dr. Robert A. Meyers, a former president of New York State Medical Society: "The purpose of [condom distribution] could only be prophylaxis, and there is no way that it could be considered a form of education".

Education relating to the use of a condom encompasses instruction concerning the benefits and risks of condom use and the proper method of condom application. The distribution of condoms is not, as contended by the respondents, an aspect of education in disease prevention, but rather is a means of disease prevention. Supplying condoms to students upon request has absolutely nothing to do with education, but rather is a health service occurring after the educational phase has ceased. Although the program is not intended to promote promiscuity, it is intended to encourage and enable students to use condoms if and when they engage in sexual activity. This is clearly a health service for the prevention of disease which requires parental consent.

Our conclusion that condom distribution is a health service is supported by a regulation of the Commissioner of the New York State Department of Education which defines the term health service to include "the several procedures * * * designed to * * * guide parents, children and teachers in procedures for preventing and correcting defects and diseases" (8 NYCRR 136.1 [d]). Similarly, the Acting Commissioner of the New York City Department of Health has said that the condom availability component of the respondents' plan "is a strong and *medically* sound program that is responsive to critical health needs" (emphasis supplied), and the resolution presented by the Chancellor of the New York City public schools with respect to the program includes the following clause: "condoms have been cited by the former Surgeon General of the United States *to be the best protection* against the sexual transmission of the HIV virus" (emphasis supplied).

The next question is whether other regulations of the Commissioner of the New York State Department of Education, which authorize school boards to distribute condoms in the public schools as part of an "AIDS instruction program" (8 NYCRR 136.3 [c]), or as part of a "program of school health service" (8 NYCRR 135.3 [c]), are determinative of the issue of whether such distribution constitutes a health service. We conclude that whether the condoms are distributed as an adjunct of a plan of instruction on HIV/AIDS or through school health offices is of no import. The supplying of condoms is conduct which constitutes a service separate and apart from education. The Legislature has not acted to authorize the provision of such a service without parental consent. Thus, the cited regulations which authorize condom distribution without prior parental consent or opt out are contrary to the common law and of no effect.

It cannot be disputed that "the State has a compelling interest in controlling AIDS, which presents a public health concern of the highest order. Nor can there be any doubt as to the blanket proposition that the State has a compelling interest in educating its youth about AIDS. Education regarding the means by which AIDS is communicated is a powerful weapon against the spread of the disease and clearly an essential component of our nationwide struggle to combat it" *(Ware v Valley Stream High School Dist.,* 75 NY2d 114, 128). However, while the purpose of the condom availability component of the program may be commendable, the Legislature has not acted to abrogate the common-law rule and to authorize the New York State Commissioner of Education or the respondents to direct or permit the delivery of such a health service to minor, unemancipated high school students in public school buildings without some parental role through opt out or consent.

Requiring parental consent or opt out for the condom availability component of the respondents' program would not violate State and Federal statutory and constitutional law as urged by the *amici,* nor would it stymie every health care provider, compelling parental consent whenever an unemancipated minor seeks contraceptive services.

Under the sections of the Social Security Act governing Aid to Families With Dependent Children and Medicaid, family planning services and supplies must be provided to all eligible recipients, including sexually active minors *(see,* 42 USC § 602

[a] [15]; § 1396d [a] [4] [C]). The State laws governing these programs also require that contraception be made available to "eligible persons of childbearing age, including children who can be considered sexually active" (Social Services Law § 350 [1] [e]; *see,* Social Services Law § 365-a [3] [c]; *see also,* 18 NYCRR 431.7, 463.2 [b] [1], [2]; 463.6 [requiring provision of family planning services to minors eligible for public assistance, Medicaid, or supplemental security income, and to foster children]). These laws entitle eligible minors to confidential services from any provider who treats them under the auspices of one of the public assistance programs previously mentioned.

In addition, title X of the Public Health Service Act, the largest source of Federal funding for family planning programs throughout the nation, mandates that minors receive confidential services *(see,* 42 USC § 300 [a]; 42 CFR 59.5 [a] [4]; 59.15). Interpreting these statutes as requiring that adolescents be treated confidentially, on the basis of their own consent, the Federal courts have invalidated both State laws and Federal and State regulations that imposed parental consent or notification requirements on teenagers entitled to family planning services under these programs *(see, Jones v T. H.,* 425 US 986 [invalidating State regulations that mandated parental consent for family planning services to otherwise eligible minors]; *see also, Planned Parenthood Assn. v Dandoy,* 810 F2d 984; *Jane Does 1 through 4 v State of Utah Dept. of Health,* 776 F2d 253; *State of New York v Heckler,* 719 F2d 1191).

These statutes are merely legislatively enacted exceptions to requirements of parental consent *(see also,* Public Health Law § 2781 [1] [providing that HIV-related tests may be administered upon the written, informed consent of anyone, including a minor if the person has an ability to understand and the capacity to consent]; § 2305 [2] [which dispenses with consent or knowledge of a parent in the diagnosis or treatment of a sexually transmissible disease]). It is for the Congress or the Legislature, not the courts—and certainly not the State Commissioner of Education or a board of education—to provide the exceptions to parental consent requirements. Neither Congress nor the New York State Legislature has enacted an exception for the health service at issue here. The distribution of condoms in our public high schools, where attendance is compulsory, even though condoms are nonmedicinal and require no prescription, is quite different from making them

available at clinics, where attendance is wholly voluntary, or as part of public assistance programs. There is no specific authority for the condom availability component of the respondents' program, no matter how commendable its purpose may be.

Nor does *Carey v Population Servs. Intl.* (431 US 678) require a different determination. In that case, the United States Supreme Court struck down New York Education Law § 6811 (8) which made it a crime to sell or distribute any contraceptive to a minor under the age of 16 years or for anyone other than a licensed pharmacist to distribute contraceptives to persons 16 years of age or over. The Court held that the constitutional right of privacy in connection with decisions affecting procreation extends to minors as well as to adults. In declaring the statute unconstitutional, the Court reasoned that a prohibition against all sales would have a devastating effect upon the freedom to choose contraception and that limiting distribution to licensed pharmacists imposed a significant impermissible burden upon such freedom.

Holding that the condom availability component of the program is unauthorized in no way affects or restricts the access to condoms which existed prior to the adoption of the plan. In an advisory opinion to the respondents, New York City Corporation Counsel conceded after reviewing *Carey* and related cases: "[S]ince the Board has no obligation to make condoms available and minors still have the opportunity to obtain condoms (freely or at minimal cost) from other sources without parental consent, it would be permissible for the Board to make parental consent a prerequisite to condom availability or to give the parents the opportunity to exclude their children from the program".*

The *amici* argue that "the [condom availability component of the] Program is * * * consistent with the practice of health providers in this state, who routinely prescribe and distribute contraceptives and offer other HIV/AIDS and reproductive

---

* *Parents United for Better Schools v School Dist. of Philadelphia Bd. of Educ.* (25 Phila 27) is the only reported case in the United States (that we have found) which deals with the availability of condoms in public high schools. In that case, the Philadelphia School Board authorized "teachers and the like" to give condoms to public high school students on a request and pilot basis, but provided for a parental opt out. The court held that because of the opt-out provision, the plaintiffs did not have standing under Pennsylvania law to bring the proceeding and therefore dismissed the complaint.

health services to minors on the basis of their own consent". The *amici* miss the point. The primary purpose of the Board of Education is not to serve as a health provider. Its reason for being is education. No judicial or legislative authority directs or permits teachers and other public school educators to dispense condoms to minor, unemancipated students without the knowledge or consent of their parents. Nor do we believe that they have any inherent authority to do so.

### PARENTAL RIGHTS TO REAR THEIR CHILDREN AS THEY SEE FIT

■ The petitioner parents are being compelled by State authority to send their children into an environment where they will be permitted, even encouraged, to obtain a contraceptive device, which the parents disfavor as a matter of private belief. Because the Constitution gives parents the right to regulate their children's sexual behavior as best they can, not only must a compelling State interest be found supporting the need for the policy at issue, but that policy must be essential to serving that interest as well. We do not find that the policy is essential. No matter how laudable its purpose, by excluding parental involvement, the condom availability component of the program impermissibly trespasses on the petitioners' parental rights by substituting the respondents in loco parentis, without a compelling necessity therefor.

The petitioners enjoy a well-recognized liberty interest in rearing and educating their children in accord with their own views (US Const 14th Amend; NY Const, art I, § 6; *see also, Roe v Wade,* 410 US 113, 153; *Pierce v Society of Sisters,* 268 US 510, 535; *Meyer v Nebraska,* 262 US 390, 399). Intrusion into the relationship between parent and child requires a showing of an overriding necessity *(see, Wisconsin v Yoder,* 406 US 205, 214; *Matter of Marie B.,* 62 NY2d 352, 358). The minority points to the fact that student participation in the condom availability component of the expanded HIV/AIDS program is wholly voluntary, devoid of any penalty for non-participation, and that parents are still free to provide guidance on this and related (or unrelated) issues. However, these factors do not constitute proof that the petitioners are not being forced to surrender a parenting right—specifically, to influence and guide the sexual activity of their children without State interference.

Parents must send their children to school *(see,* Education

Law §§ 3205, 3212, 3233), and unless they pay for private education (something the petitioners assert they are financially unable to do) that school must be one controlled by the respondents. This is the key distinction between the situation these petitioners face and that faced by the parents who sued in *Doe v Irwin* (615 F2d 1162). In *Doe* the plaintiffs were attempting to enjoin the distribution of contraceptive devices to their children at a public clinic. The clinic, however, was not inside a school or other building where the parents were obliged by law to send their children. Consequently, in *Doe* there was no State compulsion on parents to send their children into an environment where they had unrestricted access to free contraceptives, which is precisely what the petitioners in the instant matter must do.

This is not a case in which parents are complaining solely about having their children exposed to ideas or a point of view with which they disagree or find offensive. We would agree that, standing alone, such opposition would falter in the face of the public school's role in preparing students for participation in a world replete with complex and controversial issues *(see, Mozert v Hawkins County Bd. of Educ.,* 827 F2d 1058, *cert denied sub nom. Mozert v Hawkins County Pub. Schools,* 484 US 1066). However, the condom availability component of the respondents' distribution program creates an entirely different situation. Students are not just exposed to talk or literature on the subject of sexual behavior; the school offers the means for students to engage in sexual activity at a lower risk of pregnancy and contracting sexually transmitted diseases. The extent to which individual minors would be affected by the availability of contraceptives in the public school system if the distribution of condoms on the scale envisioned by the respondents were to become commonplace cannot presently be ascertained.

Undoubtedly, the respondents, too, do not wish to encourage sexual activity among minors but only to slow the spread of AIDS. Nevertheless, in determining whether this program intrudes on parental rights in the first instance the issue is not one of purpose but one of effect. We must take great care not to be blinded by the concept that the end justifies the means. In accord with the foregoing, we conclude that the policy intrudes on the petitioners' rights by interfering with parental decisionmaking in a particularly sensitive area. Through its public schools the City of New York has made a judgment that minors should have unrestricted access to

contraceptives, a decision which is clearly within the purview of the petitioners' constitutionally protected right to rear their children, and then has forced that judgment on them.

Because we believe that the petitioner parents have demonstrated an intrusion on their constitutionally protected right to rear their children as they see fit, we turn next to the issue: whether a compelling State interest is involved and whether this program is necessary to meet it. There is no question, as the Court of Appeals has stated, that "the State has a compelling interest in controlling AIDS, which presents a public health concern of the highest order" *(Ware v Valley Stream High School Dist.,* 75 NY2d 114, 128, *supra)*. However, the Court also noted that "[a]s with other grave risks we have faced during the past two centuries, the threat of AIDS cannot summarily obliterate this Nation's fundamental values" *(Ware v Valley Stream High School Dist., supra,* at 129). Accordingly, we must ask whether an interference in the petitioners' rights is necessary to meet this public health threat. Specifically, can it be said that absent the program challenged by the petitioners, sexually active students, educated by the schools to the danger of sexually transmitted diseases, will be unable to acquire condoms without difficulty? The answer must clearly be no. We no longer live in an age where minors find it difficult or socially unacceptable to obtain contraceptives at a local drug or convenience store. It is hardly a secret that condoms are now displayed next to vitamins and cold remedies. Moreover, minors may purchase condoms legally *(see, Carey v Population Servs. Intl.,* 431 US 678, *supra)*, and the cost is hardly exorbitant (as the petitioners note, a condom may be purchased for about the same price as a slice of pizza). Further, in their brief in support of the respondents, the *amici* point out that there are publicly funded nonschool programs where condoms are available to minors as part of confidential family planning, as provided under the Social Security Act and Public Health Service Act.

Finally, the distribution can go forward without interfering with the petitioners' rights simply by allowing parents who are interested in providing appropriate guidance and discipline to their children to "opt out" by instructing the school not to distribute to their children without their consent. We are not blind to the possibility that children of parents who elect to "opt out" will become or remain sexually active, but in view of the access to condoms discussed previously this

59

possibility cannot serve as a reason to interfere with the parents' right to discourage that behavior.

We conclude that the condom availability component of the respondents' program violates the petitioners' constitutional due process rights to direct the upbringing of their children.

### FREE EXERCISE OF RELIGION

■ The condom availability program does not violate the petitioning parents' rights to the free exercise of their religion.

As stated in *Mozert v Hawkins County Bd. of Educ.* (827 F2d 1058, 1063, *supra),* the "question to be decided is whether a governmental requirement that a person be exposed to ideas he or she finds objectionable on religious grounds constitutes a burden on the free exercise of that person's religion as forbidden by the First Amendment" of the United States Constitution or New York Constitution, article I, § 3. The answer is that it does not.

The gist of the petitioners' claim is that they find the condom availability component of the program to be objectionable on religious grounds because it may tempt their children to stray from their religious beliefs. Such a contention does not state a viable claim based on the Free Exercise Clause. "The central question in identifying an unconstitutional burden is whether the claimant has been denied the ability to practice his religion or coerced in the nature of those practices" *(Rector of St. Bartholomew's Church v City of New York,* 914 F2d 348, 355). At bar, any student who fails or refuses to participate is not visited with a sanction. Nor is this a case in which anyone who refuses to participate is held criminally liable *(see, Wisconsin v Yoder,* 406 US 205, *supra)* or denied a benefit *(see, Thomas v Review Bd. of Ind. Empl. Sec. Div.,* 450 US 707; *Sherbert v Verner,* 374 US 398).

The petitioners' contentions that the students are "bombarded" with information respecting the program, and that they may be tempted to succumb to peer pressure, do not rise to the level of a constitutional violation. " 'It is true that * * * indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment * * *. This does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting

contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions. The crucial word in the constitutional test is "prohibit" ' " *(Rector of St. Bartholomew's Church v City of New York, supra,* at 355, quoting *Lyng v Northwest Indian Cemetery Protective Assn.,* 485 US 439, 450-451).

The condom availability component of the respondents' program does not prohibit the petitioning parents and/or their children from practicing their religion. Nor does it directly or indirectly coerce them to engage in conduct or practices which are contrary to their religious beliefs. "Moreover, parents have no constitutional right to tailor public school programs to individual preferences, including religious preferences" *(Ware v Valley Stream High School Dist.,* 75 NY2d 114, 125, *supra; see, Epperson v Arkansas,* 393 US 97, 106).* Merely because the petitioners find the program objectionable does not render it violative of their right to the free exercise of their religion *(see, Mozert v Hawkins County Bd. of Educ.,* 827 F2d 1058, *supra; Smith v Board of Educ.,* 844 F2d 90).

CONCLUSION

In light of our determination that the condom availability component lacks common-law or statutory authority, and violates the petitioners' civil rights to rear their children as they see fit, the order and judgment must be reversed insofar as appealed from. Accordingly, the respondents are prohibited from dispensing condoms to unemancipated, minor students without the prior consent of their parents or guardians, or without an opt-out provision, and the petition is granted to the extent that (1) it is declared that the condom availability component of the respondents' plan constitutes a health service rather than health education and thus, in the absence of a provision requiring the prior consent of unemancipated, minor students' parents or guardians, or in the absence of an opt-out provision, lacks common-law or statutory authority, and (2) it is declared that the respondents' plan to dispense condoms to unemancipated, minor children without the consent of their parents or guardians, or an opt-out provision, violates the civil rights of the parent petitioners and similarly situated parents or guardians under the substantive Due Process Clauses of the Fourteenth Amendment of the United States Constitution and New York Constitution, article I, § 6. In all other respects, the petition is denied.

EIBER, J. (dissenting). As is by now well known, Acquired Immune Deficiency Syndrome (AIDS) results from infection with the Human Immunodeficiency Virus (HIV). The virus, which damages an infected person's immune system by destroying white blood cells, is transmitted chiefly through the exchange of blood and blood products, and through sexual relations. Although sexual abstinence and refraining from certain high risk behavior will prevent the transmission of the AIDS virus, Dr. Margaret Hamburg, the Acting Commissioner of the New York City Department of Health, has noted that "the reality is that adolescents are engaging in sexual intercourse in large numbers". Dr. Hamburg has further noted that while New York City adolescents comprise only 3% of the nation's teenagers, they account for 20% of all reported cases of adolescent AIDS in the United States. Moreover, 29% of all AIDS cases in the United States are diagnosed in young adults between the ages of 20 to 29. Since the disease has an 8-to-10-year latency period, according to Dr. Hamburg, "this statistic suggests that the majority of those persons must have been infected as adolescents".

In an effort to prevent the spread of the HIV virus and to protect this City's youngsters, in September 1987, the Regulations of the New York State Commissioner of Education were amended to direct all elementary and secondary schools to provide appropriate AIDS instruction as part of the health education curriculum (see, 8 NYCRR 135.3 [b] [2]; [c] [2]). Following his appointment in late 1990, former Board of Education Chancellor Joseph Fernandez proposed expanding the existing HIV/AIDS curriculum to provide comprehensive education in the transmission and prevention of the disease. In addition, former Chancellor Fernandez proposed supplementing classroom instruction by making condoms available, on a voluntary basis, to high school students who requested them. Thereafter, on February 27, 1991, the New York City Board of Education voted to adopt a resolution authorizing the former Chancellor to make condoms available to those students who request them in New York City high schools as part of an over-all HIV/AIDS education program. Although the Board considered the possibility of allowing parents who disapprove of the distribution of condoms to opt out of the voluntary program, the Board concluded that an opt-out provision would be unwise because students whose parents disapprove of premarital sexual relations may especially "be in need of a place where they can obtain condoms without

having to account for any expenditures of funds or having to identify themselves in order to get the condoms". Moreover, the respondents were concerned that a parental opt-out provision, which would require students to identify themselves before they could be given a condom, "would so seriously limit participation in the program as to make it ineffective in reaching many of those students who most need it".

By verified petition dated November 25, 1991, the petitioner parents commenced this proceeding seeking, *inter alia*, a declaration that the condom distribution program implemented by the former Chancellor violated their civil rights under the substantive Due Process Clause of the Fourteenth Amendment of the United States Constitution, and a declaration that Public Health Law § 2504 required the respondents to obtain the prior consent of the parents or guardians of unemancipated minor students before the respondents may dispense condoms and provide personal health guidance to and counseling regarding condoms to such students. Although the Supreme Court dismissed the petition, concluding that the condom distribution program did not violate the parents' constitutional rights or the New York State Public Health Law, the majority would reverse and grant the petition. For the reasons which follow, I respectfully dissent.

The majority concludes, in essence, that the condom distribution component of the expanded HIV/AIDS curriculum is a "health service" within the meaning of Public Health Law § 2504, and that since the statute does not expressly dispense with the need for parental consent to distribute condoms to students under the age of 18, the program violates the common-law prohibition against providing health care to minors absent such consent.* However, I cannot agree with the majority's conclusion that the condom distribution program constitutes a "health service" of the same nature as the invasive medical, dental, health and hospital treatment contemplated by the statute or the common law.

Public Health Law § 2504 authorizes individuals over the age of 18 to consent to medical, dental, health and hospital

---

* While the majority seems to suggest that the dictates of the common-law rule could be satisfied by allowing parents to opt their children out of the voluntary program, this position is inconsistent. If the condom distribution program is indeed a health service as contemplated by Public Health Law § 2504 and the common law, students under the age of 18 may participate in the program only with parental consent. A parent or guardian's failure to "opt out" is not the equivalent of consent.

services. The statute, which was enacted in 1972, when the age of majority in this State was 21, represents a modification of the common-law rule that a minor is not legally competent to give binding consent to any medical services rendered to him or herself (see, Hughson v St. Francis Hosp., 92 AD2d 131, 135; see also, Skeels, In Re E. G.: The Right of Mature Minors in Illinois to Refuse Lifesaving Medical Treatment, 21 Loy U Chi LJ 1199-1200, 1209).

Prior to the enactment of Public Health Law § 2504, there were no statutory guidelines for physicians to follow in treating persons under 21 years of age, and legislative history indicates that this provision was enacted in order to "expedite the delivery of health care to those under 21" (Letter of Tarky Lombardi, Jr., Chairman of Sen Comm on Health, May 8, 1972, Bill Jacket, L 1972, ch 769). The creation of a statutory right enabling a minor over the age of 18 to consent to medical treatment was further noted to be consistent with "the recent movement towards enlargement of the political and legal responsibilities of persons in the 18 to 21 year age bracket" (Mem of NY State Dept of Social Servs, Bill Jacket, L 1972, ch 769). In keeping with the goal of expediting the provision of health care to minors, the statute additionally permits emergency medical treatment to be rendered to children under the age of 18 without parental consent where an attempt to secure such consent would delay treatment and thus increase the risk to the child's life or health. Although the statute does not expressly codify the common-law rule that an infant is unable to consent to medical, dental, health or hospital services, "[a]n implicit corollary" of the provision is that a person under 18 years of age may not give effective consent for such services (Matter of Thomas B., 152 Misc 2d 96, 98).

Despite the fact that neither the statute nor the common law defines the phrase "health services", the majority would construe the phrase so broadly that it encompasses the distribution of condoms, which are noninvasive devices which protect the body without affecting it. The majority cites no authority of any kind for its sweeping construction of the term "health services", and instead points to various portions of the record in which the respondents acknowledge that the condom distribution program is intended to prevent the spread of HIV. However, the fact that the program may have the salutary effect of reducing a sexually active adolescent's risk of being infected with HIV and AIDS does not render the

condom distribution program a health service which can be provided to a child under the age of 18 only with parental consent.

While the condom distribution program is, as the Supreme Court recognized, clearly "health related", neither Public Health Law § 2504, which was enacted to *expand* the ability of certain minors to consent to medical treatment, nor the common-law rule contemplated preventing high school students from participating in such a program. AIDS is a new threat which the common-law rule was not designed to meet, and nothing in the common law or legislative history of the statute suggests that it was intended to restrict an unemancipated minor's access to nonprescriptive devices to prevent the spread of disease. Thus, it is anomalous to construe the phrase "health services" as a means of restricting the rights of minors of high school age to voluntarily request condoms, which minors in this State are permitted to purchase or obtain from a variety of other sources.

Moreover, contrary to the majority's contention, to engraft a parental consent requirement onto the condom distribution program would run counter to the United States Supreme Court's holding in *Carey v Population Servs. Intl.* (431 US 678). At issue in *Carey* was the constitutionality of a New York statute which made it a crime for any person to sell or distribute a contraceptive device to a minor under the age of 16. In concluding that the statute was invalid, the plurality opinion noted that minors, as well as adults, are protected by the Constitution and possess constitutional rights, including the right to privacy in connection with decisions affecting procreation *(Carey v Population Servs. Intl., supra,* at 692-693). The plurality opinion further reasoned that: "Since the State may not impose a blanket prohibition, or even a blanket requirement of parental consent, on the choice of a minor to terminate her pregnancy, the constitutionality of a blanket prohibition of the distribution of contraceptives is *a fortiori* foreclosed. The State's interests in protection of the mental and physical health of the pregnant minor, and in protection of potential life are clearly more implicated by the abortion decision than by the decision to use a nonhazardous contraceptive" *(Carey v Population Servs. Intl., supra,* at 694).

Furthermore, the majority's conclusion that the distribution of condoms is encompassed by the common-law prohibition against providing medical treatment without consent, is at odds with the fact that minors in this State are permitted to

obtain abortions and treatment for sexually transmitted diseases without parental consent or notification (see, Public Health Law § 2305). Surely, if minors are permitted to obtain treatment for the consequences of unprotected sexual intercourse without parental consent or notification, it is inconsistent to restrict their access to the means by which they can prevent an unwanted pregnancy or protect themselves from sexually transmitted diseases, including the deadly HIV virus.

In addition, while the majority turns a blind eye to the potential ramifications of its interpretation of the common-law rule, the fact remains that if the distribution of condoms is a "health service" which cannot be undertaken without parental consent, then the many family planning clinics throughout this State which distribute condoms and other contraceptive devices to minors must also be deemed in violation of the common law and statute. Similarly, if condoms cannot be provided to minors in the absence of parental consent, then it logically follows that the commercial sale of condoms to minors violates the Public Health Law and is illegal. Thus, a broad interpretation of the the term "health services" to preclude distribution of condoms to minors without parental consent would have a significant impact upon the ability of minors to obtain condoms, and thus violate their constitutionally recognized right to make such decisions privately.

I further disagree with the majority's conclusion that the condom distribution program unreasonably interferes with the petitioner parents' liberty interest in directing the upbringing and education of their children. This right was first recognized by the United States Supreme Court in Meyer v Nebraska (262 US 390), where the Court considered the validity of a statute which prohibited the teaching of foreign languages to children who had not yet completed the eighth grade. The avowed purpose of the statute was that "the English language should be and become the mother tongue of all children reared in this state" (Meyer v Nebraska, supra, at 398). The Supreme Court concluded that the Nebraska statute unreasonably infringed upon the liberty guaranteed to the plaintiff under the Fourteenth Amendment, which provides that "[n]o State shall * * * deprive any person of life, liberty, or property, without due process of law". In reaching this conclusion, the Court observed that while it had not "attempted to define with exactness the liberty" guaranteed by the Fourteenth Amendment, "[w]ithout doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to con-

tract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men" *(Meyer v Nebraska, supra,* at 399). The Court further noted that this liberty interest "may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect" *(Meyer v Nebraska, supra,* at 399-400). The Court then found that although the Nebraska Legislature's desire "to foster a homogeneous people with American ideals" was easy to appreciate, "the means adopted * * * exceed the limitations upon the power of the State and conflict with rights assured to plaintiff * * * [t]he interference is plain enough and no adequate reason therefor in time of peace and domestic tranquility has been shown" *(Meyer v Nebraska, supra,* at 402).

Following *Meyer v Nebraska* (262 US 390, *supra),* the Supreme Court again concluded, in *Pierce v Society of Sisters* (268 US 510), that an Oregon statute which required all children between the ages of 8 and 16 to attend public school unreasonably interfered with the liberty of parents and guardians to direct the upbringing and education of children under their control. In sustaining a parent's authority to provide religious schooling to his or her children, the Court declared that "[t]he fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations" *(Pierce v Society of Sisters, supra,* at 535).

In contrast, in *Prince v Massachusetts* (321 US 158), the Supreme Court upheld the conviction of a Jehovah's Witness who permitted her niece to sell copies of the Watchtower in violation of Massachusetts' child labor laws. In reaching its conclusion that the Massachusetts statute which banned children from selling newspapers and magazines was not unconstitutional, the Court reasoned that although "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents", the "family itself is not beyond regula-

tion in the public interest, as against a claim of religious liberty * * * And neither rights of religion nor rights of parenthood are beyond limitation" *(Prince v Massachusetts, supra,* at 166). In this regard, the Court added that: "Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death" *(Prince v Massachusetts, supra,* at 166-167).

Here, the majority attempts to bring this case within the ambit of *Meyer v Nebraska* (262 US 390, *supra)* and its progeny by reasoning that, despite the voluntary nature of the program, the petitioner parents are being forced to surrender their right to influence and guide the sexual activity of their children without State interference. However, the mere fact that parents are required to send their children to school does not vest the condom distribution program with the aura of "compulsion" necessary to make out a viable claim of deprivation of a fundamental constitutional right. Unlike *Meyer v Nebraska* (262 US 390, *supra)* where a State attempted to totally prohibit parents from permitting their children to study a foreign language until after completion of the eighth grade, or *Pierce v Society of Sisters* (268 US 510, *supra)* where a State attempted to prohibit parents from sending their children to private parochial schools, the element of compulsion is totally absent here. The petitioners are free to impart their religious and moral values to their children in the privacy of their own homes, and to instruct their children not to participate in the condom distribution program.

Similarly, in *Doe v Irwin* (615 F2d 1162), the Sixth Circuit Court of Appeals rejected a claim that parental rights were violated by a publicly operated family planning clinic which provided teenagers with contraceptives without notice to their parents. Although the plaintiff parents in *Doe v Irwin (supra),* as in the case at bar, argued that the clinic's practices violated their liberty interest in raising their children, the Sixth Circuit rejected this argument, noting that there was a fundamental difference between a birth control clinic which dis-

pensed contraceptive devices and family planning information only at the request of an interested individual, and the fact patterns of cases such as *Meyer v Nebraska* (262 US 390, *supra)* and *Pierce v Society of Sisters* (268 US 510, *supra),* where a State was either requiring or prohibiting some activity. In support of its holding, the court reasoned:

"The State of Michigan, acting through the Center and defendants, has imposed no compulsory requirements or prohibitions which affect the rights of the plaintiffs. It has merely established a voluntary birth control clinic. There is no requirement that the children of the plaintiffs avail themselves of the services offered by the Center and no prohibition against the plaintiffs' participating in decisions of their minor children on issues of sexual activity and birth control. The plaintiffs remain free to exercise their traditional care, custody and control over their unemancipated children * * *

"Since we find no unconstitutional interference with the plaintiffs' rights as parents, there is no need to consider whether a 'compelling' state interest was involved. For the same reason, it is not necessary to determine whether parental rights 'outweigh' those of their minor children" *(Doe v Irwin,* 615 F2d, *supra,* at 1168-1169).

The majority's assertion that *Doe v Irwin (supra)* is distinguishable because the petitioners at bar are compelled to send their children into an environment (i.e., the public high schools) where condoms are available is without legal merit. Although placing a health resource room in each high school where condoms and educational information about their use are available may make condoms more readily accessible to teenagers, the fact that students are in closer proximity to a potential source of contraceptive devices does not change the fundamentally voluntary nature of the program. While condom distribution programs are in place in the high schools that the petitioners' children attend, nothing compels the petitioners' children to participate in the program. Moreover, while the petitioners argue that to expose their children to an environment where condoms are available undermines their efforts to impart their religious and moral values to their children, it should be noted that the instructional component of the HIV/AIDS curriculum takes pains to stress, in accordance with State regulations, that abstinence is the most appropriate and effective premarital protection against AIDS *(see,* 8 NYCRR 135.3 [b] [2]; [c] [2] [i]), and that among the

reasons for abstinence is adherence to the values of one's parents and one's religion.

The constitutionality of condom distribution to minors without parental consent has clearly been established by our highest courts *(see, Carey v Population Servs. Intl.,* 431 US 678, *supra; Doe v Irwin,* 615 F2d 1162, *supra).* State and Federally funded programs providing for condom distribution to minors without parental consent have been in effect for years. The significant issue in this case is whether voluntary condom distribution to minors in public schools so differs from accepted similar Federal- and State-funded programs as to be violative of constitutionally protected parental rights. Stated differently, do parents have constitutionally protected rights in regard to school condom programs which do not exist in regard to State and Federally funded clinics and in spite of a minor's ability to purchase such devices readily at public vending machines? Since I do not view the distribution of condoms as a health service, but rather as a practical accessory to effectuate a health education program, I find no rational basis for discerning either statutory violations or a violation of constitutionally protected parental rights resulting from the distribution of these nonintrusive devices, merely because preventive health concerns affecting children are being addressed in public schools.

Although the majority correctly points out that children are compelled to attend school (as contrasted to health clinics), it fails to consider that they are not compelled either to seek or accept the distribution of condoms, as it remains a purely voluntary program. Moreover, the distribution of condoms in the public schools is entirely consistent with the accepted role schools have traditionally assumed in regard to health education, i.e., preventive health care. Clearly, it is not the proper role of the educational system to ignore reality. Despite the fact that teenagers are instructed that abstinence is the most effective method of preventing the transmission of the HIV virus, many teenagers are nevertheless sexually active, and must be advised that condom use is imperative. Public schools, with their unique ability to reach large numbers of teenagers, can play a significant role in urging the benefit of abstinence, in increasing AIDS awareness, and in alerting those students who are sexually active of the importance of using condoms in order to reduce the risk of disease. Moreover, the condom distribution component of the educational program makes condoms more readily accessible to those students who are

already sexually active and might otherwise engage in unprotected intercourse. In view of the public policy interest in slowing the spread of the HIV virus, the condom distribution program is not inconsistent with the educational mission of the public schools.

It must also be recognized that at the heart of the petitioners' argument that the condom distribution program violates their right to raise their children as they see fit is their belief that the program constitutes an endorsement of teenage sexual activity because it tells their children, "in actions far louder than words that they are free to disobey their parents' express instructions". However, this is but a variation upon an argument which was rejected by the Supreme Court in *Carey v Population Servs. Intl.* (431 US 678, *supra)*. As previously noted, *Carey* involved the constitutionality of a New York statute which prohibited the sale or distribution of contraceptives to minors under the age of 16. The State of New York argued that significant State interests were served by restricting minors' access to contraceptives because free availability to minors of contraceptives would lead to increased sexual activity among the young, in violation of the policy of New York to discourage such behavior. In rejecting this argument, the plurality opinion noted that the State's argument was in essence that "minors' sexual activity may be deterred by increasing the hazards attendant on it", but that such an argument could not be taken seriously because " '[i]t would be plainly unreasonable to assume that [the State] has prescribed pregnancy and the birth of an unwanted child [or the physical and psychological dangers of an abortion] as punishment for fornication' " *(Carey v Population Servs. Intl.,* 431 US 678, 694, 695, *supra,* quoting *Eisenstadt v Baird,* 405 US 438, 448).

Moreover, Justice Stevens, separately concurring in part in the plurality opinion in *Carey,* aptly observed:

"Common sense indicates that many young people will engage in sexual activity regardless of what the New York Legislature does; and further, that the incidence of venereal disease and premarital pregnancy is affected by the availability or unavailability of contraceptives. Although young persons theoretically may avoid those harms by practicing total abstention, inevitably many will not. The statutory prohibition denies them and their parents a choice which, if available, would reduce their exposure to disease or unwanted pregnancy.

"The State's asserted justification is a desire to inhibit sexual conduct by minors under 16. Appellants do not seriously contend that if contraceptives are available, significant numbers of minors who now abstain from sex will cease abstaining because they will no longer fear pregnancy or disease. Rather appellants' central argument is that the statute has the important *symbolic* effect of communicating disapproval of sexual activity by minors. In essence, therefore, the statute is defended as a form of propaganda, rather than a regulation of behavior.

"Although the State may properly perform a teaching function, it seems to me that an attempt to persuade by inflicting harm on the listener is an unacceptable means of conveying a message that is otherwise legitimate. The propaganda technique used in this case significantly increases the risk of unwanted pregnancy and venereal disease" *(Carey v Population Servs. Intl.,* 431 US, *supra,* at 714-715).

Similarly, at bar the petitioners seek to force the Board of Education to, at minimum, allow parents to "opt out" their children from participation in the program. If an opt-out feature is adopted, however, students will no longer be able to request condoms anonymously. The respondents have reasonably concluded that this loss of confidentiality would deter student participation in the condom distribution program, thus reducing its effectiveness. In the years following the Supreme Court's decision in *Carey v Population Servs. Intl.* (431 US 678, *supra),* the spread of AIDS has reached alarming proportions giving rise to a compelling State interest to halt the growth of the epidemic. Clearly, many parents, such as the petitioners, are seeking to provide guidance to their children and to protect their health and morality. The majority overlooks the unfortunate reality that many children lack such interested parents. Many children have no parents to provide guidance and discipline or who are even available to consent to the child's participation in the program should an "opt out" be mandated. Since the consequence of contracting AIDS is death, providing practical protection against the spread of the virus which causes it, to a high-risk population, in my view, outweighs the minimal intrusion into the parent/child relationship of the more protected, more fortunate portion of the adolescent population of New York City.

Consequently, I would affirm the order and judgment appealed from.

MILLER, J. (dissenting). I wholeheartedly concur with Justice Eiber's dissent but do so separately merely to emphasize one additional point. The intrusion into the relationship between parent and child due to the fact that the respondents' condom distribution plan contains no parental consent or opt-out provision is indeed supported by overriding necessity. That the New York City adolescent population is significantly overrepresented in reported HIV cases nationwide is persuasive evidence of an unusually high-risk population, and therefore of a particularly strong and compelling State interest justifying this program. Justice Eiber has noted the unfortunate reality that a significant number of New York City high school students do not have parents interested in providing them with appropriate guidance and discipline, or who are available to consent to their child's participation in the program. Moreover, some students who have interested parents are beyond their practical control in matters of sexuality. The undeniable fact is that many children are at risk. Because AIDS is deadly, minimal intrusion into the parent/child relationship is justified in this case by the overriding necessity to protect all adolescents from infection with HIV by the most effective means possible.

Consequently, I too, vote to affirm the order and judgment appealed from.

BALLETTA, J. P., and COPERTINO, J., concur with PIZZUTO, J.; EIBER and MILLER, JJ., dissent, each in a separate opinion.

Ordered that the order and judgment (one paper) is reversed insofar as appealed from, without costs or disbursements, and the respondents are prohibited from dispensing condoms to unemancipated minor students without the prior consent of their parents or guardians, or without an opt-out provision, and it is further,

Ordered that the petition is granted to the extent that (1) it is declared that the condom availability component of the respondents' plan is a health service rather than health education and thus, in the absence of a provision requiring the prior consent of unemancipated minor students' parents or guardians, or in the absence of an opt-out provision, lacks common-law or statutory authority; and (2) it is declared that the respondents' plan to dispense condoms to unemancipated minor children without the consent of their parents or guardians, or an opt-out provision, violates the civil rights of the parent petitioners and similarly situated parents or guardians

under the substantive Due Process Clauses of the Fourteenth Amendment of the United States Constitution and New York Constitution, article I, § 6; and it is further,

Ordered that the petition is denied in all other respects; and it is further,

Ordered that the matter is remitted to the Supreme Court, Richmond County, for the entry of an amended order and judgment accordingly.